UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

LAWRENCE E. GILDER,

                              Plaintiff,

      -against-

JOHN P. GULINO, both individually and in
his capacity as the Chairman of the
DEMOCRATIC COMMITTEE OF
RICHMOND COUNTY, DEMOCRATIC
COMMITTEE OF RICHMOND COUNTY,
BOARD OF ELECTIONS IN THE CITY
OF NEW YORK, CLERK 1, CLERK 2 and
CLERK 3, said names being as of yet
unidentified parties, JOHN and JANE
DOES 1-10, said names being fictitious;
XYZ ENTITIES 1-10, said names being
fictitious,

                            Defendants.

-------------------------------------------------------X

Claim No.:

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

      Plaintiff Lawrence E. Gilder (hereinafter referred to as "Mr. Gilder") by and through

his undersigned counsel, Richard A. Luthmann, Esq. of the Luthmann Law Firm, PLLC,

as and for his Complaint in this action against Defendant JOHN P. GULINO (hereinafter

referred to as a "Defendant" or "Gulino"), Defendant DEMOCRATIC COMMITTEE OF

RICHMOND COUNTY (hereinafter referred to as a "Defendant" or "DCRC"),  Defendant

BOARD OF ELECTIONS IN THE CITY OF NEW YORK (hereinafter referred to as a

"Defendant" or "NYCBOE") (together Gulino, DCRC, NYCBOE, as well as CLERK 1,

CLERK 2 and CLERK 3, as well as JOHN and JANE DOES 1-10 and XYZ ENTITIES 1-

10 are collectively referred to as the "Defendants") hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, punitive damages and attorneys' fees, to redress Defendants' unlawful practices and retaliation against Plaintiff, including Defendants' unlawful discrimination against Plaintiff because of his race/color and/or national origin in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Section 1983 of the Civil Rights Act of 1866, 42 U.S.C. § 1983 ("Section 1983"), Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d et seq. ("Title VI"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the New York State Human Rights Law, New York Executive Law § 290 et seq. ("NYSHRL"), and the New York City Human Rights Law, New York Administrative Code § 8-101 et seq. ("NYCHRL").

2.      In sum and substance, Defendants, including but not limited to, Gulino, DCRC and NYCBOE subjected Plaintiff to unlawful discrimination because of, *inter alia*, his race/color and/or national origin because Gulino, while "State Actor" under applicable law, placed his (and the DCRC which he controls as Chairman's) selection process for the Democratic Party nominee for the office of United States Congressman for New York's Eleventh (NY-11) Congressional District in the Special Election held on May 5, 2015, within the ambit of impermissible invidious discrimination as against Mr. Gilder. With respect to his opportunity to interview for the job of Congressman, Mr. Gilder, who is African-American and a descendant of the Cherokee Native American Nation has and had clear constitutional, statutory and common law rights and said rights were violated by Defendants who have caused Mr. Gilder severe and substantial harm and anguish.

2

3.      Defendants' conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff, which has caused and continues to cause Plaintiff to suffer substantial economic and non-economic damages, permanent harm to his professional and personal reputation, and severe mental anguish and emotional distress.  Attorneys' fees and punitive damages are available in addition to compensatory damages and declaratory and injunctive relief.

4.      Defendants' conduct also violated the Fifteenth Amendment of the United States Constitution insofar as it relates to the franchise.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's civil rights under the federal constitution, 42 U.S.C. § 2000d (Title VI), 42 U.S.C. § 2000e (Title VII), Section 1981 and Section 1983. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

### Plaintiff Lawrence E. Gilder

7.      Plaintiff LAWRENCE E. GILDER is a resident of Staten Island, New York, a black man in America, a member of the Cherokee Nation, a grandfather, a lover, a political activist, and a registered voter and enrolled member of the Democratic Party in Richmond County, New York.

3

8.      Mr. Gilder was subjected to invidious discrimination based upon, *inter alia*, his race, color and/or natural origin, in violation of applicable law at the hands of the Defendants.

### Defendant John P. Gulino

9.      Defendant JOHN P. GULINO is the Chairman of the Defendant DEMOCRATIC COMMITTEE OF RICHMOND COUNTY, an unincorporated association.

10.     Defendant GULINO is the elected political party leader of the Democratic Party in Richmond County, New York, and is a "local officer" as that term is defined under the New York State Public Officers Law.  See NY CLS Pub O § 2.

11.     Defendant GULINO is the elected Democratic Party Chair of the Democratic County Committee of Richmond County, under the Rules of the Democratic Party of the State of New York.

12.     Defendant GULINO is the Treasurer of the Democratic Committee of the State of New York, David Paterson, State Chair.

13.     Defendant GULINO has been engaged in questionable political dealings since at least the Administration of New York City Mayor Ed Koch.

14.     While Defendant GULINO was a member of the City Planning Commission, his role in Staten Island Projects was questioned because of alleged violations of the New York City Charter and the Ethics Rules, as apparent improprieties abounded.  See EXHIBIT "A".

15.     During the Koch Administration, Defendant GULINO was under investigation by Federal and City prosecutors.  See EXHIBIT "B".

4

16.     Defendant GULINO resigned his position on the City Planning Commission amid the impanelling of a Grand Jury in Richmond County and the confirmation of a joint investigation by the New York City Department of Investigation with the United States Attorney for the Eastern District of New York.  See EXHIBIT "C".

17.     Defendant GULINO was elected County Chairman of the Defendant DEMOCRATIC COMMITTEE OF RICHMOND COUNTY in 2007.

18.     Since at least 2007, Defendant GULINO has been in a power position akin to that of indicted Former New York State Assembly Speaker Sheldon Silver with respect to Richmond County.  See EXHIBIT "D".

19.     Upon information and belief, Defendant GULINO is one of "Three Men in a Room" along with an as of yet unidentified CLERK and another person.

20.     Defendant GULINO is an attorney.  See EXHIBIT "E".

21.     At all relevant times, Defendant GULINO acted as a State Actor.

22.     At all relevant times, Defendant GULINO acted under color of law.

23.     Defendant GULINO may be served personally at his offices at 85 New Dorp Lane, Staten Island, New York.

**Defendant Democratic Committee of Richmond County**

24.     Defendant DEMOCRATIC COMMITTEE OF RICHMOND COUNTY, an unincorporated association, is the recognized County Committee under the Rules of the Democratic Party of the State of New York.

25.     At all relevant times, Defendant DCRC acted as a State Actor.

26.     At all relevant times, Defendant DCRC acted under color of law.

27.    Defendant DEMOCRATIC COMMITTEE OF RICHMOND COUNTY is an unincorporated association of more than seven members.  Jurisdiction may be obtained by personal service upon an officer thereof whose position corresponds to that of president *viz.*- DEFENDANT JOHN P. GULINO.  *B. K. Bruce Lodge v Subcommittee of Management*, 208 A.D. 100, 203 N.Y.S. 149, 1924 N.Y. App. Div. LEXIS 4987 (N.Y. App. Div. 1924).

### Defendant Board of Elections in the City of New York

28.    Defendant Board of Elections in the City of New York ("NYCBOE") is an administrative body of ten Commissioners, two from each borough upon recommendation by both (Democrat and Republican) political parties and then appointed by the City Council for a term of four years. The Commissioners appoint a bipartisan (Democrat and Republican) staff to oversee the daily activities of its main and five borough offices.  The Board is responsible under New York State Election Law for Voter registration, outreach and processing, Maintain and update voter records, Processing and verification of candidate petitions/documents, Campaign finance disclosures of candidates and campaign committees, Recruiting, training and assigning the various Election Day officers to conduct elections, Operate poll site locations, Maintain, repair, setup and deploy the Election Day operation equipment, Ensure each voter their right to vote at the polls or by absentee ballot, Canvassing and certification of the vote, Voter education, notification and dissemination of election information, and Preparation of maps of various political subdivisions.

29.   Defendant NYCBOE functions under a system of "bipartisanship." Bipartisanship means control of the election process by the two major parties (Republican and Democrat).

30.   The system of bipartisanship at the Defendant NYCBOE causes patronage, incompetence, nepotism and other ethical conflicts and indefensible institutional corruption.  See, e.g., EXHIBIT "F".

31.   Defendant NYCBOE receives Federal funding.  See, e.g., EXHIBIT "G".

32.   Defendant NYCBOE has an obligation to ensure that the entire election process, including the selection of candidates for office, in done by a process whereby no person is subjected to invidious discrimination based upon, *inter alia*, his or her race, color and/or natural origin, in violation of applicable law

33.   The system of bipartisanship at the Defendant NYCBOE that causes patronage, incompetence, nepotism and other ethical conflicts and indefensible institutional corruption, caused the actions and/or omissions whereby the Plaintiff Mr. Gilder was harmed.

34.   At all relevant times, Defendant NYCBOE acted as a State Actor.

35.   At all relevant times, Defendant NYCBOE acted under color of law.

36.   Defendant NYCBOE may be served at its offices at 32 Broadway, 7th Floor, New York, New York 10004.

## CLERK 1

37.   Upon information and belief, CLERK 1 is a lobbyist.

38.   Upon information and belief, CLERK 1 is the member of a firm that is under investigation.

39.     Upon information and belief, CLERK 1 has great influence with Defendant GULINO.

40.     Upon information and belief, CLERK 1 has great influence with Defendant NYCBOE, particularly the Staten Island Borough Office.

41.     Upon information and belief, CLERK 1 is one of "Three People in the Room" in Richmond County.

## CLERK 2

42.     Upon information and belief, CLERK 2 is a political operative.

43.     Upon information and belief, CLERK 2 may work for the Comptroller's Office.

44.     Upon information and belief, CLERK 2 may have been an Executive Director (Glorified Secretary) for a County Democratic Organization in New York City.

45.     Upon information and belief, CLERK 2 has engaged in and/or facilitated invidious discrimination.

## CLERK 3

46.     Upon information and belief, CLERK 3 is a political operative.

47.     Upon information and belief, CLERK 3 may work as an Executive Director (Glorified Secretary) for a County Democratic Organization in New York City.

48.     Upon information and belief, CLERK 3 has engaged in and/or facilitated invidious discrimination.

## PROCEDURAL REQUIREMENTS

49.     Plaintiff has complied with all statutory prerequisites to filing this action.

50.    On or about March 1, 2015, Mr. Gilder filed a complaint with the United States Equal Opportunity Employment Commission (EEOC) New York Office.  Said complaint is attached herewith as EXHIBIT "H".

51.    In a letter mailed April 27, 2015, the U.S. EEOC cleared administrative preconditions for Mr. Gilder to bring this lawsuit.  See EXHIBIT "I".

## FACTUAL ALLEGATIONS

52.    This complaint centers around a job – the job of U.S. Representative for New York's 11th Congressional District (NY-11) – and the process by which the Democratic Party's candidate for the job – a process tainted by invidious discrimination.

### Mr. Gilder's Pattern as a Political Activist in the Democratic Party

53.    On January 5, 2015, Mr. Gilder sent a letter to Defendant GULINO highlighting racial and ethnic insensitivity in his recent public remarks.  See EXHIBIT "J".

54.    Mr. Gilder's January 5, 2015, letter was part of a pattern of letters sent to political and elected officials as part of Mr. Gilder's activities as a political activist, concerned citizen, watchdog and red-blooded American who believes in equal justice under law.  See EXHIBIT "K".

55.    Mr. Gilder is a founder of the Democratic Committee of Richmond County, Inc. and has a history of writing to elected officials seeking positive change.  See EXHIBIT "L".

56.    Mr. Gilder has carried Democratic Party petitions and literatures and delivered signs for numerous Democratic Party politicians including Debi Rose, Leticia James, Michael McMahon, Bill DeBlasio and others.

57.    In a show of stunning political acumen, Mr. Gilder actually supported Mr. Grimm's campaign realizing that the "paper case" against Mr. Grimm would likely lead to his departure from Congress and Mr. Gilder's opportunity to have a chance at an open seat for the job of U.S. Representative.

**The Resignation of Michael Grimm and the Special Election under New York Law**

58.    Effective on January 5, 2015, Congressman Michael G. Grimm resigned his seat as U.S. Representative for New York's 11th Congressional District (NY-11).

59.    Continuing his pattern of political activism, Mr. Gilder joined a lawsuit to compel the New York Governor (the "Executive Authority") to set a date for the Special Election to fill the vacancy in New York's 11th Congressional District (NY-11).   See EXHIBIT "M".

60.    The United States Constitution states:

> When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.  U.S. Const. Art. I, § 2, Cl 4.

61.    The Governor of New York had a mandatory duty under U.S. Const. Art. I, § 2, cl. 4 to proclaim a special election to fill a vacancy in the United States House of Representatives.

62.    The Governor's proclamation of a Special Election must be made consistent with N.Y. Pub. Off. Law § 42 which states:

> A special election shall not be held to fill a vacancy in the office of a representative in congress unless such vacancy occurs on or before the first day of July of the last year of the term of office, or unless it occurs thereafter and a special session of congress is called to meet before the next general election, or be called after September nineteenth of such year; nor to fill a vacancy in the office of state senator or in the office of member of assembly, unless the vacancy occurs before the

first day of April of the last year of the term of office, or unless the vacancy occurs in either such office of senator or member of assembly after such first day of April and a special session of the legislature be called to meet between such first day of April and the next general election or be called after September nineteenth in such year. If a special election to fill an office shall not be held as required by law, the office shall be filled at the next general election.

63.    Under the New York Election Law § 6-114, Party nominations for an office to be filled at a _special election_ for U.S. Representative shall be made in the manner prescribed by the rules of the party.

64.    Under the New York Election Law § 6-114, Party nominations for an office to be filled at a _special election_ for U.S. Representative cannot be accomplished by the petitioning process to obtain ballot access.

65.    The Rules of the Democratic Party of the State of New York, ARTICLE VI, Section 2(a)(iii) state [_in pertinent part_]:

> (a) Nominations for an office to be filled at a special election, nominations for election to fill a vacancy, or nominations to fill a vacancy in a nomination, shall be made:
> (iii) if for an office in any other political subdivision of the State, then by the district or party committee thereof...

66.    The Rules of the Democratic Party of the State of New York, Article II, Section 3(a)(ii) state:

> If a political subdivision consists of more than one county, then the district or party committee for such subdivision shall be composed of the Chair of the County Committees of the various counties, or parts of counties, situated within the political subdivisions.

67.    New York's 11th Congressional District (NY-11) is a congressional district for the United States House of Representatives in New York City.  The NY-11

district includes all of Staten Island and parts of southern Brooklyn, including the neighborhoods of Bay Ridge, Bensonhurst, Dyker Heights, and Gravesend.

68.    In the May 5, 2015 Special Election for the Congressional Seat in NY-11, the candidates were chosen, pursuant to the Rules of the Democratic Party of the State of New York, by the Democratic Chairs of the County Committees of the various counties of Kings and Richmond, in this case Frank Seddio in Brooklyn and Defendant John Gulino in Staten Island.

69.    At all relevant times, Defendant John Gulino was the _de facto_ selector of the Democratic Party's candidate in the May 5, 2015 Special Election for the Congressional Seat in NY-11.

70.    At all relevant times, Defendant John Gulino was the _de facto_ selector of the Democratic Party's candidate in the May 5, 2015 Special Election for the Congressional Seat in NY-11, because in the history, custom and practice, the choice is deferred to the County Leader who comprises the larger portion of the district or political subdivision.

## The Black Man in America: The Criminal Justice System

71.    Mr. Gilder is a Black Man in America.

72.    The Black Man in America is subject to disproportionate interaction with the criminal justice system.

73.    According to the Constitutional Rights Foundation:

a.    African Americans accounted for more than a third of the arrests in 2010 for violent crimes. This far surpasses their numbers in the population.

b. African-Americans also have a disproportionately high arrest rate for drug possession and trafficking. Blacks are only 12 percent of the population and 13 percent of drug users, but they constituted almost a third of those arrested in 2010. This may be due in part to the use of "racial profiling."

74.   A RAND Corporation study found that convicted African-Americans were more likely than whites to go to prison. And their sentences were longer. "This disparity," the study concluded, "suggests that probation officers, judges, and parole boards are exercising discretion in sentencing or release decisions in ways that result in de facto discrimination against blacks." De facto means the discrimination exists in fact, but without legal authority. It may not be intentional.  See http://www.crf-usa.org/brown-v-board-50th-anniversary/the-color-of-justice.html.

75.   Unintended discrimination can occur at many points in the legal process. Probation officers often prepare pre-sentencing reports for a judge. The judge uses the reports to help make sentencing decisions. Reports include information on the criminal's prior record, family background, education, marital status, and employment history. Many African-Americans convicted of crimes come from deprived backgrounds. They may have things in their record — unemployment, trouble in school, family problems — that judges, who largely come from middle-class backgrounds, cannot relate to. This may sway some judges to treat them more harshly in sentencing.

76.   Discrimination can occur at many points in the job selection process for the job of Congressional Representative for the NY-11 District in a Special Election. A CLERK / Glorified Secretary often prepares pre-interview reports for a County Leader/Selector.

13

The County Leader/Selector uses the reports to help make job selection decisions. Reports include information on the job candidate's prior record, family background, education, marital status, and employment history. Many African-Americans come from deprived backgrounds. They may have things in their record — unemployment, trouble in school, family problems — that the County Leaders/Selectors, who largely come from middle-class backgrounds, cannot relate to. This may sway some County Leaders/Selectors to treat them differently from job candidates who are white / of European Descent.

### **The Congressional Representative in America: The Criminal Justice System**

77.   Those who have held the job of Congressional Representative are no strangers to run-ins with the criminal justice system.

78.   According to the Congressional Research Service, committing a crime cannot constitutionally disqualify someone from serving in Congress. And the state has no say in determining whether or not someone is qualified to serve in the House or Senate:

> [S]ince a State does not have the authority to add qualifications for federal offices, the fact of conviction, even for a felony offense, could not be used to keep a candidate off of the ballot under State law either as a direct disqualification of convicted felons from holding or being a candidate for office, or as a disqualification of one who is no longer a "qualified elector" in the State. Once a person meets the three constitutional qualifications of age, citizenship and inhabitancy in the State when elected, that person, if duly elected, is constitutionally "qualified" to serve in Congress, even if a convicted felon.

79.   Here is a short list of those who have held the job of Congressional Representative and who have also run-ins with the law:

a.  REP. MARIO BIAGGI (D-NY): In 1988 he was convicted of obstructing justice, tax evasion, conspiracy, extortion, and accepting bribes.

b.  REP. ALBERT BUSTAMANTE (D-TX): Convicted in 1993 of racketeering and accepting an illegal gratuity.

c.  REP. WES COOLEY (R-OR): Convicted of falsifying VA loan applications. Paid $7,000 in fines plus court costs, and placed on probation. Subsequently tried to gather support to get re-elected to Congress.

d.  REP. BOB DORNAN (R-CA): In 1983 attempted to leave Grenada with a stolen AK-47. It was confiscated by the Army and destroyed.

e.  REP. WALTER FAUNTROY (D-DC): Financial disclosure misdemeanor (1995).

f.  REP. BARNEY FRANK (D-MA): Accessory to a male prostitute who ran a whorehouse in their Washington townhouse.

g.  REP. CARROL HUBBARD (D-KY): Convicted in 1994 of misappropriation of funds.

h.  REP. GERALD KLECZKA (D-WI): Convicted of DUI in 1987; arrested for DUI in 1990 and 1995.

i.  REP. JOE KOLTER (D-PA): Fraud and conspiracy (1996).

j.  REP. NORMAN LENT (R-NY): In 1982 tried to have fifty counterfeit Rolex watches mailed to him from Taiwan.

k.  REP. DONALD E. "BUZ" LUKENS (R-OH): In 1989 was convicted of contributing to the delinquency of a minor.

15

l.   REP. NICK MAVROULES (D-MA): In 1991 pleaded guilty to charges of bribery and tax evasion.

m.  REP. EDWARD MEZVINSKY (D-IA): Indicted in March of 2001 on federal fraud charges. Claimed that he developed mental problems after using a malaria drug called Lariam. "Clearly, the responsibility lies with the manufacturers," claimed Mezvinsky's lawyer, Michael Barrett.

n.   REP. JAMES MORAN (D-VA): Charged with spousal abuse, and assault and battery. A regular instigator of bar fights while mayor of Alexandria, VA, his position made him immune to arrest. Once said he thought about becoming a boxer because "I like to hit people."

o.   REP. AUSTIN J. MURPHY (D-PA): Vote fraud, including forgery, conspiracy, and tampering with federal records (1999).

p.   REP. MARY ROSE OAKAR (D-OH): Charged with seven federal felonies related to financial-disclosure irregularities (1998).

q.   REP. CARL PERKINS (D-KY): In 1994 pleaded guilty to filing a false financial-disclosure statement, conspiracy to file false statements with the Federal Election Commission, and bank fraud. Sentenced in March of 1995.

r.   REP. MEL REYNOLDS (D-IL): In 1995 was convicted of having sex with a minor and obstructing justice.

s.   REP. DAN ROSTENKOWSKI (D-IL): Illegally converted official funds to his personal use and mail fraud; accused in 1996 of embezzling $700,000 from the federal government, he was charged with 13 of the

16

original 17 counts against him. Went to prison after serving in Congress; now back in Washington working as a lobbyist.

t.   REP. LARRY SMITH (D-FL): In 1993 was convicted of income tax evasion and campaign-reporting violations.

u.   REP. PAT SWINDALL (R-GA): In 1988 was convicted of perjury.

v.   REP. JIM TRAFICANT (D-OH): Indicted on 5/4/01 by a Cleveland, OH federal grand jury for bribery, tax evasion, racketeering, conspiracy, and obstruction of justice. Found guilty of all charges in April 2002.

w.   REP. WALTER TUCKER (D-CA): Federal extortion charges; convicted of accepting $30,000 worth of bribes while a Congressman, and sentenced to 27 months in the federal penitentiary.

80.    Most germane to the New York (NY-11) District, Former Congressional Representative for Staten Island and Brooklyn Vito Fossella was sentenced to five days in jail in December of 2008 related to a DUI arrest while Congressman.

81.    Recent polling shows that Vito Fossella is still beloved by a substantial number of Staten Islanders and Brooklynites and was considered a viable candidate prior to the NY-11 2015 Special Election for the job of Congressional Representative.

## The Defendants' Obligations in the Selection Process

82.    Defendants, as State Actors / quasi-State Actors under color of law, had an obligation to ensure that the selection process for the Democratic Party's candidate in the May 5, 2015 Special Election for the job of U.S. Representative was free from invidious discrimination.

83.    The Fifteenth Amendment to the United States Constitution compelled Defendants to ensure that the selection process for the Democratic Party's candidate in the May 5, 2015 Special Election for the job of U.S. Representative was free from invidious discrimination.

84.    The Fifteenth Amendment to the United States Constitution compelled Defendants to ensure that the selection process for the Democratic Party's candidate in the May 5, 2015 Special Election for the job of U.S. Representative was free from invidious discrimination.

85.    Defendants had an obligation to ensure that the selection process for the Democratic Party's candidate in the May 5, 2015 Special Election for the job of U.S. Representative was free from unlawful discrimination against Plaintiff because of his race/color and/or national origin in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Section 1983 of the Civil Rights Act of 1866, 42 U.S.C. § 1983 ("Section 1983"), Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d et seq. ("Title VI"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the New York State Human Rights Law, New York Executive Law § 290 et seq. ("NYSHRL"), and the New York City Human Rights Law, New York Administrative Code § 8-101 et seq. ("NYCHRL")

86.    The Rules of the Democratic Party of the State of New York, ARTICLE I, Section 1(b) compelled Defendant GULINO to act so as not to engage in unlawful discrimination against Plaintiff because of his race/color and/or national origin:

> No test for membership in, nor any oath of loyalty to, the Democratic Party of New York shall be required or used that has the effect of requiring prospective or current members of the Democratic Party to acquiesce in, condone, or support

discrimination on the grounds of race, sex, age, color, creed, national origin, religion, ethnic identity, sexual orientation, disability, or economic status.

87.    The Rules of the Democratic Party of the State of New York, ARTICLE I, Section 2(d) compelled Defendant GULINO, the STATE TREASURER, to act in a way so as inform all interested parties a full description of the legal and practical procedure to interview for the job of U.S. Representative, which Defendant GULINO would ultimately select:

> The Democratic Party of New York shall publicize fully and in such manner as to assure notice to all interested parties a full description of the legal and practical procedure for selection of the Party's officers and representatives on all levels. Publication of these procedures shall be made in such fashion that all prospective and current members of the Party in the State of New York will be fully and adequately informed of the pertinent procedures in time to participate in each selection procedure at all levels of the Party's organization.

88.    The Rules of the Democratic Party of the State of New York, ARTICLE VII, Section 1 compelled Defendant GULINO to act ethically:

> Public trust in party leadership is essential if the Democratic Party in New York State is to achieve continued success and deserve it. Rules of ethical guidance for the conduct of party leaders can help earn that public trust. It is essential that party leadership not be used for private gain.

89.    The Defendants had an obligation not to engage in, allow or condone invidious discrimination because by operation of the New York Election Law, Public Officers Law and Rules of the Democratic Party of the State of New York, the Defendants were State Actors with respect to the selection process for the Democratic Party's

candidate in the May 5, 2015 Special Election for the job of U.S. Representative in NY-11.

90.    The Defendants' selection process for the Democratic Party's candidate in the May 5, 2015 Special Election for the job of U.S. Representative in NY-11 violated United States Supreme Court precedent because the Defendants were State Actors:

> A political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform. These rights are circumscribed, however, when the State gives the party a role in the election process--as New York has done by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot. Then, for example, the party's racially discriminatory action may become state action that violates the Fifteenth Amendment. And then also the State acquires a legitimate governmental interest in assuring the fairness of the party's nominating process, enabling it to prescribe what that process must be. The United States Supreme Court has, for example, considered it to be too plain for argument that a State may prescribe party use of primaries or conventions to select nominees who appear on the general-election ballot. That prescriptive power is not without limits. (_N.Y. State Bd. of Elections v Lopez Torres_, 552 U.S. 196, 198 (2008) (Scalia, J.).

91.    The Defendants' selection process for the Democratic Party's candidate in the May 5, 2015 Special Election for the job of U.S. Representative in NY-11 violated United States Supreme Court precedent because the Defendants were State Actors insofar as the May 5, 2015 Special Election did not allow a petitioning process:

> New York has a second mechanism for placement on the final election ballot. One who seeks to be a [ballot candidate in New York] may qualify by a petition process. The petition must be signed by [a specified number of] voters (depending on the district). This requirement has not been shown to be an unreasonable one, a point respondents appear to concede.

True, the candidate who gains ballot access by petition does not have a party designation; but the candidate is still considered by the voters. ***The petition alternative changes the analysis***. Cf. *Munro* v. *Socialist Workers Party*, 479 U.S. 189, 199, 107 S. Ct. 533, 93 L. Ed. 2d 499 (1986) ***[emphasis added]***. (*N.Y. State Bd. of Elections v Lopez Torres*, 552 US 196, 210-211 (2008) (Kennedy, J., concurring).)

### Defendant GULINO's Open Publication for Interviews for the Job as NY-11 Congressional Representative and Mr. Gilder's Expressed Interest

92.    In the public record of the Staten Island Advance newspaper on January 12, 2015, Defendant GULINO stated that he would interview each individual expressing interest in running for the open Congressional seat left vacant by Mr. Grimm's resignation.

93.    Defendant GULINO stated: "I'm old fashioned in a lot of ways, that people who are interested you must interview them and see what they have to say."    See EXHIBIT "N".

94.    On January 15, 2015, induced by the fact that Defendant GULINO would interview each individual expressing interest in running for the open Congressional Seat, Mr. Gilder sent by certified mail and facsimile a letter expressing his interest in the NY-11 Congressional Seat.  See EXHIBIT "O".

95.    Mr, Gilder said: "We both can meet at my favorite restaurant in New Dorp, La Strada, and eat some Sicilian food and break bread while we discuss my vision for the 11th Congressional District, one you obviously have never considered."

96.    Defendant GULINO never responded to Mr. Gilder's letter dated January 15, 2015.

97.    On January 30, 2015, induced by the fact that Defendant GULINO would interview each individual expressing interest in running for the open Congressional Seat,

Mr. Gilder <u>once again</u> sent by certified mail and facsimile a letter expressing his interest in the NY-11 Congressional Seat.  See EXHIBIT "P".

98.    Defendant GULINO never responded to Mr. Gilder's letter dated January 30, 2015.

99.    On February 11, 2015, induced by the fact that Defendant GULINO would interview each individual expressing interest in running for the open Congressional Seat, Mr. Gilder <u>once again</u> sent by facsimile a letter expressing his interest in the NY-11 Congressional Seat.  See EXHIBIT "Q".

100.    Defendant GULINO never responded to Mr. Gilder's letter dated January 30, 2015.

101.    Mr. Gilder is an African American, black man and also a Native American member of the Cherokee Nation.

102.    Upon information and belief, **only** white persons of European Descent were interviewed by Defendant GULINO prior to February 11, 2015.

103.    Upon information and belief, **only** white persons of European Descent were interviewed by Defendant GULINO to become the Democratic Party's candidate in the May 5, 2015 Special Election for a shot at the job of U.S. Representative in NY-11 prior to February 11, 2015, and these persons included:

a.    MICHAEL CUSICK

b.    MICHAEL E. McMAHON

c.    ROBERT HOLST

d.    LAURIE HONOR

e.    BILL COLTON

f.    VINCENT GENTILE

104.    Upon information and belief, **no** persons of non-European Descent were interviewed by Defendant GULINO to become the Democratic Party's candidate in the May 5, 2015 Special Election for a shot at the job of U.S. Representative in NY-11 prior to February 11, 2015.

105.    Upon information and belief, **no** African Americans were interviewed by Defendant GULINO to become the Democratic Party's candidate in the May 5, 2015 Special Election for a shot at the job of U.S. Representative in NY-11.

106.    Upon information and belief, **no** Native Americans were interviewed by Defendant GULINO to become the Democratic Party's candidate in the May 5, 2015 Special Election for a shot at the job of U.S. Representative in NY-11.

107.    Upon information and belief, **no** black persons were interviewed by Defendant GULINO to become the Democratic Party's candidate in the May 5, 2015 Special Election for a shot at the job of U.S. Representative in NY-11.

108.    Upon information and belief, **no** persons of non-European Descent were interviewed by Defendant GULINO to become the Democratic Party's candidate in the May 5, 2015 Special Election for a shot at the job of U.S. Representative in NY-11 because Defendant GULINO's process was tainted by invidious discrimination.

109.    Upon information and belief, **no** persons of non-European Descent were interviewed by Defendant GULINO to become the Democratic Party's candidate in the May 5, 2015 Special Election for a shot at the job of U.S. Representative in NY-11 because Defendant GULINO's process was tainted by invidious discrimination and Defendant GULINO was a State Actor at the time.

## Defendant GULINO's Pattern of Discrimination

110.    Defendant GULINO has a pattern in engaging in invidious discrimination in his official capacity as Chairman of the Defendant DEMOCRATIC COMMITTEE OF RICHMOND COUNTY.

111.    On or about January 15, 2014, Defendant GULINO, on letterhead of the Defendant DEMOCRATIC COMMITTEE OF RICHMOND COUNTY, sent a letter to Robert J. Castro.  See EXHIBIT "R".

112.    The January 15, 2014 Letter to Castro was signed by Defendant GULINO.

113.    Upon information and belief, the January 15, 2014 Letter to Castro was drafted by CLERK 2.

114.    The January 15, 2014 Letter to Castro can only be described as blatant ageism and discrimination by Defendant GULINO based on Castro's age.

115.    On November 25, 2014, the January 15, 2014 Letter to Castro and supporting documents were sent, *inter alia*, to the New York State Democratic Committee, David Paterson, Chairman, as a formal grievance.  To date, no response has been received.  Defendant GULINO is the TREASURER of the New York State Democratic Committee.

## CLAIMS FOR RELIEF
### FIRST CAUSE OF ACTION
### (Discrimination in Violation of Section 1981)

116.    Plaintiff hereby repeats and realleges each and every allegation in the previous paragraphs, inclusive, as if fully set forth herein.

117.    Defendants and each and every one of them have discriminated against Plaintiff on the basis of his race/color (BLACK) in violation of Section 1981 by denying

him the same terms and conditions of employment available to employees who are not BLACK, including but not limited to, subjecting him to disparate interview conditions and denying him the opportunity to interview to seek employment.

118.    Defendants and each and every one of them have discriminated against Plaintiff on the basis of his race/color (African American) in violation of Section 1981 by denying him the same terms and conditions of employment available to employees who are not African American, including but not limited to, subjecting him to disparate interview conditions and denying him the opportunity to interview to seek employment.

119.    Defendants and each and every one of them have discriminated against Plaintiff on the basis of his race/color/national origin (Native American/ Cherokee Nation) in violation of Section 1981 by denying him the same terms and conditions of employment available to employees who are not Native American/ from the Cherokee Nation, including but not limited to, subjecting him to disparate interview conditions and denying him the opportunity to interview to seek employment.

120.    Defendants and each and every one of them have discriminated against Plaintiff on the basis of his race/color/national origin in violation of Section 1981 by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile job interview environment that included, among other things, severe and pervasive harassment of Plaintiff because of his race/color/national origin.

121.    As a direct and proximate result of Defendants' and each and every one of their unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-

esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

122.    Defendants' unlawful and discriminatory conduct in violation of Section 1981 was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Violation of Section 1983 – FIRST AND FIFTEENTH AMENDMENTS)

123.    Plaintiff hereby repeats and realleges each and every allegation in the previous paragraphs, inclusive, as if fully set forth herein.

124.    Defendants, and each and every one of them, acted with discriminatory purpose under color of law.

125.    Defendants, and each and every one of them, acted with discriminatory purpose in violation of Plaintiffs' rights to civic association and the franchise guaranteed by the First and Fifteenth Amendment to the United States Constitution and applicable to the States by the Fourteenth Amendment.

126.    As a direct and proximate result of Defendants' and each and every one of their unlawful and discriminatory conduct in violation of Section 1983 - Plaintiffs' rights to civic association and the franchise guaranteed by the First and Fifteenth Amendment to the United States Constitution and applicable to the States by the Fourteenth Amendment, Plaintiff has suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering,

26

as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

127.    Defendants' and each and every one of their unlawful and discriminatory conduct in violation of Section 1983 - Plaintiffs' rights to civic association and the franchise guaranteed by the First and Fifteenth Amendment to the United States Constitution and applicable to the States by the Fourteenth Amendment was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (Discrimination and Harassment in Violation of Title VII)

128.    Plaintiff hereby repeats and realleges each and every allegation in the previous paragraphs, inclusive, as if fully set forth herein.

129.    Defendants and each and every one of them have discriminated against Plaintiff on the basis of his race/color (BLACK/AFRICAN AMERICAN) and/or national origin (NATIVE AMERICAN/CHEROKEE NATION) in violation of Title VII by denying him the same terms and conditions of interview for employment available to employees who are not BLACK/AFRICAN AMERICAN and/or NATIVE AMERICAN/CHEROKEE NATION, including but not limited to, subjecting him to disparate interviewing conditions and denying him the opportunity to interview for work in an employment setting free of unlawful harassment.

130.    Defendants and each and every one of them have discriminated against Plaintiffs on the basis of his race/color and/or national origin in violation of Title VII by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a

hostile interviewing environment for employment that included, among other things, severe and pervasive harassment of Plaintiff because of his race/color and/or national origin.

131.    As a direct and proximate result of Defendants' and each and every one of their unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

132.    Defendants', and each and every one of their unlawful and discriminatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Discrimination and Harassment in Violation of the NYSHRL)

133.    Plaintiff hereby repeats and realleges each and every allegation in the previous paragraphs, inclusive, as if fully set forth herein.

134.    Defendants and each and every one of them have discriminated against Plaintiff on the basis of his race/color (BLACK/AFRICAN AMERICAN) and/or national origin (NATIVE AMERICAN/CHEROKEE NATION) in violation of Title VII by denying him the same terms and conditions of interview for employment available to employees who are not BLACK/AFRICAN AMERICAN and/or NATIVE AMERICAN/CHEROKEE NATION, including but not limited to, subjecting him to disparate interviewing conditions

28

and denying him the opportunity to interview for work in an employment setting free of unlawful harassment.

135.    Defendants and each and every one of them have discriminated against Plaintiffs on the basis of his race/color and/or national origin in violation of the NYSHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile interviewing environment for employment that included, among other things, severe and pervasive harassment of Plaintiff because of his race/color and/or national origin.

136.    As a direct and proximate result of Defendants' and each and every one of their unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

137.    Defendants', and each and every one of their unlawful and discriminatory conduct in violation of the NYSHRL was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### FIFTH CAUSE OF ACTION
### (Discrimination and Harassment in Violation of the NYCHRL)

138.    Plaintiff hereby repeats and realleges each and every allegation in the previous paragraphs, inclusive, as if fully set forth herein.

139.    Defendants and each and every one of them have discriminated against Plaintiff on the basis of his race/color (BLACK/AFRICAN AMERICAN) and/or national

origin (NATIVE AMERICAN/CHEROKEE NATION) in violation of Title VII by denying him the same terms and conditions of interview for employment available to employees who are not BLACK/AFRICAN AMERICAN and/or NATIVE AMERICAN/CHEROKEE NATION, including but not limited to, subjecting him to disparate interviewing conditions and denying him the opportunity to interview for work in an employment setting free of unlawful harassment.

140.    Defendants and each and every one of them have discriminated against Plaintiffs on the basis of his race/color and/or national origin in violation of the NYCHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile interviewing environment for employment that included, among other things, severe and pervasive harassment of Plaintiff because of his race/color and/or national origin.

141.    As a direct and proximate result of Defendants' and each and every one of their unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

142.    Defendants', and each and every one of their unlawful and discriminatory conduct in violation of the NYCHRL was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Reckless Supervision of the Special Election – Title VI Violation)

143.    Plaintiff hereby repeats and realleges each and every allegation in the previous paragraphs, inclusive, as if fully set forth herein.

144.    Title VI prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving Federal financial assistance. Specifically, Title VI provides that

[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

145.    Defendants received Federal financial assistance related to the Special Election on May 5, 2015 in New York's 11th Congressional District for the job of United States Representative.

146.    Defendants and each and every one of them have discriminated against Plaintiff on the basis of his race/color (BLACK/AFRICAN AMERICAN) and/or national origin (NATIVE AMERICAN/CHEROKEE NATION) in violation of Title VI by excluding him from participation in, being denied the benefits of, or being subjected to discrimination under the interview process related to the Special Election on May 5, 2015 in New York's 11th Congressional District for the job of United States Representative.

147.    As a direct and proximate result of Defendants' and each and every one of their unlawful and discriminatory and reckless conduct in violation of Title VI, Plaintiff has suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-

esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

148.    Defendants', and each and every one of their unlawful and discriminatory and reckless conduct in violation of the NYCHRL was outrageous was done with reckless disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendant, containing the following relief:

A.  A declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State and City of New York; and

B.  An injunction and order permanently restraining Defendants from engaging in such unlawful conduct; and

C.  A temporary injunction temporarily restraining Defendants JOHN GULINO and the DEMOCRATIC COMMITTEE OF RICHMOND COUNTY from making any selections and/or appointments of candidates for elected office unless and until such time as a hearing may be had whereby said Defendants JOHN GULINO and the DEMOCRATIC COMMITTEE OF RICHMOND COUNTY show cause that their process for selections and/or appointments of candidates for elected office is not the result of invidious discrimination based upon, *inter alia*, race, color and/or natural origin; and

D.  A preliminary injunction preliminarily restraining Defendants JOHN GULINO and the DEMOCRATIC COMMITTEE OF RICHMOND COUNTY from making

any selections and/or appointments of candidates for elected office during the pendency of this action; and

E.  An order directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' discriminatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect his current and future employment and personal life; and

F.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm which Plaintiff alleges is under no uncertain terms less than TEN MILLION ($10,000,000.00) DOLLARS; Plaintiff expressly does not seek such damages as against Defendant Board of Elections of the City of New York; and

G.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment which Plaintiff alleges is under no uncertain terms less than TEN MILLION ($10,000,000.00) DOLLARS; Plaintiff expressly does not seek such damages as against Defendant Board of Elections of the City of New York; and

H.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory harm, including but not limited to, compensation for his mental anguish, humiliation, embarrassment, loss of human dignity, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries which

Plaintiff alleges is under no uncertain terms less than TEN MILLION ($10,000,000.00) DOLLARS; Plaintiff expressly does not seek such damages as against Defendant Board of Elections of the City of New York; and;

I.  An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest which Plaintiff alleges is under no uncertain terms less than TEN MILLION ($10,000,000.00) DOLLARS; Plaintiff expressly does not seek such damages as against Defendant Board of Elections of the City of New York; and;

J.  An award of punitive damages which Plaintiff alleges under no uncertain terms should be fixed at an amount less than TEN MILLION ($10,000,000.00) DOLLARS; and;

K.  An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

L.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated

herein.

Dated: Staten Island, New York
        July 13, 2015

Respectfully submitted,

_____
Richard A. Luthmann, Esq.
THE LUTHMANN LAW FIRM, PLLC
1811 Victory Boulevard
Staten Island, NY 10314
Tel.: (718) 447-0003
Fax: (347) 252-0254 (not for service)
Attorney for Plaintiff Lawrence E. Gilder

## VERIFICATION

**State of New York**

**County of Richmond ss.:**

LAWRENCE E. GILDER, being duly sworn, deposes and says: I am the Plaintiff in this matter. I have read the foregoing pleadings to be submitted to the Court and know the contents to be true to my own knowledge, except for those matters alleged to be on information and belief, and as to those matters, I believe them to be true.

_Lawrence Gilder_
LAWRENCE E. GILDER

Sworn to before me this 13th day

of ___July___, 20 15.

_____
**NOTARY PUBLIC**

RICHARD A LUTHMANN
NOTARY PUBLIC
STATE OF NEW YORK
REG. NO: 02LU6235872
COMM. EXP: FEB. 14, 2019