UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

LAWRENCE E. GILDER,

                         Plaintiff,

      -against-

JOHN P. GULINO, both individually and in
his capacity as the Chairman of the
DEMOCRATIC COMMITTEE OF
RICHMOND COUNTY, DEMOCRATIC
COMMITTEE OF RICHMOND COUNTY,
BOARD OF ELECTIONS IN THE CITY
OF NEW YORK, CLERK 1, CLERK 2 and
CLERK 3, said names being as of yet
unidentified parties, JOHN and JANE
DOES 1-10, said names being fictitious;
XYZ ENTITIES 1-10, said names being
fictitious,

                         Defendants.

-------------------------------------------------------X

1:15-cv-04094-KAM-RER

**MEMORANDUM OF LAW
IN OPPOSITION OF MOTION
TO DISMISS**

**The Luthmann Law Firm, PLLC
1811 Victory Boulevard
Staten Island, NY 10314
(718) 447-0003**

**By:   Richard A. Luthmann, Esq.**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………..1

SUMMARY OF THE FACTS…………………………………………………3

The Parties: Lawrence E. Gilder…………………………………………3

John P. Gulino and the Democratic Committee of
Richmond County……………………………………………………4

Board of Elections in the City of New York………………….4

The Relationship Between Gulino, the DCRC and the Board of Elections in
the City of New York………………………………………………....5

The "TRANSPARENT PROCESS": Mr. Gilder and the Open Congressional
Seat……………………………………………………………6

The Relationship between Gulino / DCRC's activities
and the NYCBOE......................................................................13


LEGAL ARGUMENT…………………………………………………..18

A. Procedural Points………………………………………………………....18
   1. The Legal Standard for Fact Discovery to Commence: Plaintiff Gilder has
      Stated Cognizable Claims…………………………………………18
   2. Jurisdictional Prerequisites…………………………………………....19
   3. Purported Immunity Arguments………………………………………20


B. Substantive Points of Law………………………………………………22
   1. United States Representative is a Job……………………………..22
   2. United States Representative is a Job and Ballot Access in New York is
      a Pre-Requisite……………………………………………………22
      A. The Special Election under New York Law…………..………22
      B. The First Amendment Associational Rights of Political Parties Are
         Strong But Not Without Limits: N.Y. State Bd. of Elections v. Lopez
         Torres, 552 US 196 (2008) – Scalia Opinion…………………....26
      C. The New York Special Election and NO PETITIONING PROCESS: The
         Kennedy Concurrence……………………………………….…27
   3. The Challenge Against the New York Special Election Scheme: Who

i

**watches the Watchmen?**...........................................................27
    **A. Hypothetical #1 - George Gypsy and the NYS KKK Party Local General Election**………………………………………………………..28

    **B. Hypothetical #2 - George Gypsy and the NYS KKK Party Local Special Election**………………………………………………………30

    **C. Hypothetical #3 - Greta Gypsy and the NYS KKK Party Local Special Election - Take 2**………………………………………………32

    **D. The Case at Issue: Gulino, the DCRC and the NYCBOE Go MUCH Further Than Their Hypothetical Counterparts in Fictional Blanco County**………………………………………………………………36

  **4. The *"TRANSPARENT PROCESS"* Of Intentional Invidious Race-Based Discrimination By A Government Actor: The *Arlington Heights* Factors**

    **A. Equal Protection From Willful and or Wanton Invidious Discrimination Is Gilder's Personal Right**………………………………………..38

    **B. A Violation of Equal Protection Requires State Action Motivated By Discriminatory Intent and the Cognizable Conduct Alleged By the Plaintiff in the Complaint Is INTENTIONAL Invidious Discrimination**………………………………………..38

    **C. Intentional Invidious Discrimination:**

    **The *Arlington Heights* Factors**………………………………………41

    **(1) Impact of the Official Action**……………………………………41

    **(2) The Historical Background of the Decision**………………..42

    **(3) The Specific Sequence of Events Leading Up To The Challenged Decision**………………………………………………………46

    **(4) Any Procedural or Substantive Departures From the Norm In Connection With the Decision**………………………………47

    **(5) The Legislative or Administrative History of the Decision or Action**………………………………………………..47

**C. Additional Point: John Gulino is an Elected Official and a Public Figure and Attempts to "Vilify" the Undersigned are an Intentional Strategy to Detract From the Real Issue – Gilder's Civil Rights Claims and the Political and Institutional Culture on Staten Island Giving Rise to Said Claims**…………………..47

**CONCLUSION**………………………………………………………….49

## <u>TABLE OF AUTHORITIES</u>

<u>United States Constitution</u>
Article I, Section 2……………………………………………………………….23


<u>United States Statutes</u>
28 U.S.C. § 1331……………………………………………………………………19
28 U.S.C. §1343……………………………………………………………………19
28 U.S.C. § 1367(a)………………………………………………………………..19
42 U.S.C. § 1981 ("Section 1981")………………………………………………19
42 U.S.C. § 1983 ("Section 1983")………………………………………………19
42 U.S.C. § 2000d ("Title VI")…………………………………………………...19
42 U.S.C. § 2000e ("Title VII")………………………………………………….19


<u>United States Supreme Court</u>
<u>Adarand Constructors, Inc.</u> v. <u>Peña</u>, 515 U.S. 200, 224, 230,
115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)…………………………………….38
<u>Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 264-265,
97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)……………………………………….38, 41
<u>Ashcroft v, Iqbal</u>, 129 S. Ct. 1937, 1949,
173 L. Ed. 2d 868 (2009)………………………………………………………...18
<u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555,
127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)…………………………………….18
<u>California Motor Transp. Co, v. Trucking Unlimited</u>, 404 U.S. 508, 515,
92 S. Ct. 609, 30 L. Ed. 2d 642 (1972)……………………………………….18
<u>Edmonson v. Leesville Concrete Co.</u>, 500 U.S. 614, 619,
111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991)………………………………….20, 48
<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818-19,
102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)…………………………………….21
<u>Hernandez v. New York</u>, 500 U.S. 352, 372-373,
111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)………………………………….38
<u>Johnson v. California</u>, 543 U.S. 499, 511-512,
125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005)………………………………….20
<u>N.Y. State Bd. of Elections v. Lopez Torres</u>, 552 US 196 (2008)…………..26, 27, 29, 30
<u>NY Times Co. v Sullivan</u>, 376 US 254 (1964)………………………………….47, 48
<u>Plessy v. Ferguson</u>, 163 U.S. 537, 559,
16 S. Ct. 1138, 41 L. Ed. 256 (1896)………………………………………….38
<u>Saucier v. Katz</u>, 533 U.S. 194,

121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)……………………………………..20, 21, 22

_Schuette v Coalition to Defend Affirmative Action_, ___US___ , ___,

134 S.Ct 1623, 1654-1656 (2014)……………………………………………38, 42


Second Circuit Court of Appeals

_Frasier v. General Elec. Co.,_ 930 F.2d 1004, 1007 (2d Cir. 1991)………….18

_Stephenson v. John Doe. Detective_, 332 F.3d 68 (2d Cir. 2003)…………...20, 21


United States District Court

_Jones v. Harris_, 665 F.Supp.2d 384, 393 (SDNY 2009)……………………19, 22


New York State Statutes

New York State Human Rights Law, New York Executive Law § 290 et seq.

("NYSHRL")………………………………………………………………………19

New York Election Law §2-112…………………………………………………..28

New York Election Law § 6-114……………………………………………30, 31, 33, 34, 35

New York Election Law § 6-116……………………………………………31, 33, 35

New York Public Officers Law § 2……………………………………………..4, 24


New York City Administrative Code

New York City Human Rights Law, New York Administrative Code § 8-101 et seq.

("NYCHRL")……………………………………………………………………..19


Other Sources

Black's Law Dictionary (8th Ed.)………………………………………………40

## PRELIMINARY STATEMENT

The Complaint in this case centers around a job – the job of U.S. Representative for New York's 11th Congressional District (NY-11) – and the process by which the Richmond County Democratic Party's (DCRC) candidate was selected for the job by its Party Leader and the certification of that selection by the Board of Elections in the City of New York– a process tainted by invidious discrimination.  Lawrence Gilder ("Gilder" or "Mr. Gilder") was not interviewed by John P. Gulino and the Democratic Committee of Richmond County ("DCRC") **BECAUSE** Lawrence E. Gilder is BLACK, COLORED and/or NATIVE AMERICAN.  The Board of Elections blindly accepted a certification from John P. Gulino and the Democratic Committee of Richmond County tainted with invidious discrimination known in the public record and with reckless disregard and/or willful ignorance to the biased and invidiously discriminatory purpose.

In the present case, had Gulino and the DCRC not injected the ***"TRANSPARENT PROCESS"*** into the public record and then "pulled the rug out" from the same ***"TRANSPARENT PROCESS"*** when Gilder stated his intentions to run for the NY-11 Congressional seat.  Gilder's intentions were unequivocally communicated to, received and known by Gulino and the DCRC (based, *inter alia.*, on the facsimile records appended to the EEOC Claim attached to the Complaint AND articles in the local news outlets discussed *infra.*)- and yet Gilder was totally ignored while the white individuals of European Descent were granted an interview and audience with Gulino and the DCRC, we would not be at the courthouse steps.

The cognizable "intentionality" of Gulino's and DCRC's invidious discrimination is discussed *infra.* and is ascertained clearly by Gulino's own statements about the

1

**_"TRANSPARENT PROCESS"_** and then Gulino and the DCRC's failure to interview Gilder AND failure to provide any non-discriminatory reason in the face of the interviews of white individuals of European Descent.   The cognizable "intentionality" of the NYCBOE's invidious discrimination is ascertained by Gulino's and the DCRC's inexorable connection to the NYCBOE and the allegations of _de facto_ control and/or influence coupled with a failure ("willful blindness" / "wantonness")  of the NYCBOE to fulfill its core function with respect to the submitted Certificate of Party Nomination – to certify that the process by which the selection was made complies with applicable law – including the U.S Constitution and its mandates as against intentional invidious discrimination – in the face of Gulino and the DCRC's **_"TRANSPARENT PROCESS"_** – which no NYCBOE official tasked as a watchdog of the Staten Island elections and ballot access process can say was not injected into the public record.

Additionally, although Gulino is an elected official and a public figure who should expect scrutiny of his activities, Gulino and the DCRC's attempt to inject the undersigned's political, personal activities and business activities into this matter in order to obfuscate are clear violations of applicable law and of Mr. Gilder's civil rights.  In short, the undersigned's political outrage and actions are not at issue here, but if they are to be strewn into the "town square" as has been attempted by Gulino and the DCRC in their submission to the CM/ECF (#26, November 23, 2015) then, in furtherance of this matter, the undersigned will continue to seek to expose the dark underbelly of Staten Island Democratic Party politics and a core group that function as a "good ol' boys" network reminiscent of the Pre-Civil Rights Era South and have intentionally and systematically excluded discrete and insular minorities (and the lawyers that challenge them) from

2

Staten Island's electoral, political and institutional process in violation of the applicable Equal Protection and Due Process dictates of the Federal Constitution.

## SUMMARY OF THE FACTS

### The Parties

### Lawrence E. Gilder

Plaintiff LAWRENCE E. GILDER ("Mr. Gilder") is a resident of Staten Island, New York. Mr. Gilder is a black man in America, a member of the Cherokee Nation, a grandfather, a lover, a political activist, a registered voter and, until his recent determination that the local Democratic Party is a racist organization that seeks to keep persons of color down in violation of state and national party rules, was an enrolled member of the Democratic Party in Richmond County, New York. Mr. Gilder is a known political activist and "gadfly", and brings this lawsuit because the commands – based on Gulino's representations in the public record - that Gilder should have been interviewed for a chance to become the Democratic Party's Candidate for the Open Seat in U.S. Congress vacated by Michael Grimm's resignation. Mr. Gilder would like to be secure that the official actions of state actors in the local Democratic Party made under the color of law – are from free racism (which the Democratic Party guarantees it does not engage in under the rules of the Democratic National Committee and the New York State Democratic Committee). Or else, Mr. Gilder believes he should lead all African Americans and persons of color in Staten Island, New York, from their traditional place in what is the now-racist "Gulino" Democratic Party where they are ignored by the

"descendants of white European immigrants" into a new Political Party where their voices can be heard and their opinions will actually matter.  See Complaint ¶¶ 53 to 57, 59.

### John P. Gulino and the Democratic Committee of Richmond County

Defendant JOHN P. GULINO ("Gulino") is the elected political party leader of the Democratic Party in Richmond County, New York, and is a "local officer" as that term is defined under the New York State Public Officers Law.  See NY CLS Pub O § 2.  At all relevant times, Gulino was a State Actor and acted under the color of law in his selection of a candidate for the Open Seat for the Public Office of United States Representative for New York's 11th Congressional District.  Gulino has a history of questionable dealings. See Complaint ¶¶ 14 to 20.

Defendant DEMOCRATIC COMMITTEE OF RICHMOND COUNTY ("DCRC"), an unincorporated association, is the recognized County Committee under the Rules of the Democratic Party of the State of New York.  The most recent Executive Director of the DCRC is THOMAS FEENEY, JR.  His predecessor was KEVIN ELKINS.

### Board of Elections in the City of New York

Defendant Board of Elections in the City of New York ("NYCBOE"), is an administrative body comprised of ten Commissioners (two from each NYC borough) upon recommendation by both majority (Democrat and Republican) political parties and then appointed by the City Council for a term of four years. The Commissioners appoint a bipartisan (Democrat and Republican) staff to oversee the daily activities of its main and five borough offices.  According to its own website available at (http://vote.nyc.ny.us/html/about/about.shtml)  *[emphasis added]*: The Board is responsible under New York State Election Law for voter registration, outreach and

4

processing, to maintain and update voter records, *Processing and verification of candidate petitions/documents*, campaign finance disclosures of candidates and campaign committees, recruiting, training and assigning the various Election Day officers to conduct elections, operate poll site locations, maintain, repair, setup and deploy the Election Day operation equipment, to ensure each voter their right to vote at the polls or by absentee ballot, canvassing and certification of the vote, Voter education, notification and dissemination of election information, and Preparation of maps of various political subdivisions.  A copy of the web page is attached the Declaration of Richard A. Luthmann (the "Declaration") as **Exhibit "A"**.

The Executive Director of the NYCBOE is MICHAEL J. RYAN.  The General Counsel of the NYCBOE is STEVEN RICHMAN.  The Executive Director of the Staten Island / Richmond County location of the NYCBOE is SHEILA DELGIORNO.

## The Relationship Between Gulino, the DCRC and the Board of Elections in the City of New York

Defendant NYCBOE functions under a system of "bipartisanship."  Bipartisanship means control of the election process by the two major parties (Republican and Democrat) and such system causes patronage, incompetence, nepotism and other ethical conflicts and indefensible institutional corruption and all the while the NYCBOE receives Federal Funding.  See Complaint ¶¶ 29 to 35.  At all relevant times, Defendant NYCBOE acted as a State Actor and under color of law.  Gulino's closest political ally and confidant in the DCRC is a well-connected Lobbyist name JON DELGIORNO, the son of Staten Island BOE Director Sheila DelGiorno.  For many years, this relationship between the DCRC and its leadership and the NYCBOE has smacked of patronage, incompetence, nepotism and other ethical conflicts and indefensible institutional

5

corruption.  In this atmosphere, it is quick easy to see how a governmental entity may wantonly rubber-stamp a candidate certification or, even engage in willful blindness as to a clearly biased and invidious process in a unilateral candidate selection by Gulino, the Party Boss.

### The "*TRANSPARENT PROCESS*": Mr. Gilder and the Open Congressional Seat

Effective on January 5, 2015, Congressman Michael G. Grimm resigned his seat as U.S. Representative for New York's 11th Congressional District (NY-11).

Article I, Section 2 of the United States Constitution sets three only three qualifications for United States Representatives.  Each Representative must: (1) be at least twenty-five years old; (2) have been a citizen of the United States for the past seven years; and (3) be (at the time of the election) an inhabitant of the state they represent.

In the public record of the Staten Island Advance newspaper on January 12, 2015, Defendant GULINO stated that he would interview each and every individual expressing interest in running for the open Congressional seat left vacant by Mr. Grimm's resignation. The Staten Island Advance reported:

> Defendant GULINO stated: "I'm old fashioned in a lot of ways, that people who are interested you must interview them and see what they have to say."  See Complaint ¶ 93.

The full Staten Island Article is attached to the Declaration as **Exhibit "B"**.

On January 12, 2015, a GULINO CANDIDATE for an interview for the open NY-11 Congressional Seat must: (1) be at least twenty-five years old; (2) have been a citizen of the United States for the past seven years; (3) be (at the time of the election) an inhabitant of the state they represent; and (4) be a person who are interested in running.

On January 15, 2015, induced by the fact that Defendant GULINO would interview each individual expressing interest in running for the open Congressional Seat, Mr. Gilder sent by certified mail and facsimile a letter expressing his interest in the NY-11 Congressional Seat.  See Complaint ¶ 94.  Defendant GULINO never responded to Mr. Gilder's letter dated January 15, 2015.

On January 15, 2015, a Lawrence E. Gilder was a GULINO CANDIDATE for an interview for the open NY-11 Congressional Seat.  He was: (1) at least twenty-five years old; (2) has been a citizen of the United States for the past seven years; (3) would be (at the time of the election) an inhabitant of the State of New York and County of Richmond; and (4) a person who are interested in running.

On January 16, 2015, Defendant GULINO appeared for an interview with NY1 News and discussed the process for the selection for the open NY-11 Congressional Seat.  The full video is available at https://www.youtube.com/watch?v=mpgPQVP7kVA and a Certified Transcript of the Interview is attached to the Declaration as **Exhibit "C"**.

In the January 16 NY1 interview, Defendant Gulino spoke about the Candidate Selection Process:

> MR. GULINO: We're at, as I've
> indicated to many newspapers and media
> outlets, we're in the process of
> interviewing potential candidates.
> I've had meetings with various
> elected officials who have expressed an
> interest in the office, and those elected
> officials, I'll mention them again, are,
> of course, Assemblyman Michael Cusick,
> former Congressman, Mike McMahon,
> Councilman Vincent Gentile, Assemblyman
> Bill Colton, and then we have some
> community activists, a gentleman by the

> name of Bob Holtz, a policeman from the
> South Shore, Bob McKenna, and various
> other assorted people who have expressed
> an interest in being heard about who
> should be the candidate.

Transcript page 2, line 20 to page 3, line 15.  Note that all of the individuals named by Mr. Gulino for consideration are White Males of European Ancestry.  Upon information and belief, Laurie Honor, a White Female of European Ancestry was also interviewed on or about January 15, 2015.  Gulino continued to describe the power that Gulino alone yielded in his "***TRANSPARENT PROCESS***" ***[emphasis added]***:

> [A]t the present time, the process that I'm
> conducting, as I've indicated to many
> people, is a very ***transparent process***. ***As
> opposed to saying, okay, this is my
> candidate, and I have that power to do so,
> I have decided that we need a much more
> transparent process***, especially in light
> of the fact that I think who represents
> the people of Staten Island in Congress is
> extremely, extremely important.

Transcript page 4 lines 2 to 11.  Gulino continued:

> [I] don't believe
> in anointed positions. I believe in a
> Democratic process. The Democratic Party
> is the party of the big tent, and I have a
> philosophy, even if people have come to
> see me and expressed an interest, don't
> officially become the candidates.
> So, I've asked each and every one of
> them, if you're not the candidate, will
> you support who my candidate is, and all
> of them have said, yes. So, I'm bringing
> more people into the Party, and I think
> that's because of this transparent
> process. I'm not creating a divisive
> atmosphere of this elected against another
> elected.
> I believe in -- I'm basically a

8

> peacemaker. I try and bring people
> together, and that's been my whole
> philosophy in life as the Chairman of the
> Democratic Party on Staten Island.

Transcript page 4, lines 16 to page 5, line 14.  Gulino continued ***[emphasis added]***:

> The Staten Island Democratic Party is
> now the ***most cohesive, all-inclusive party***
> that it's ever been. The Democratic
> County Committee ***has people of all faiths,***
> ***religions, creed and color***, and I'm very
> proud of that.

Transcript page 5, lines 15 to 20.  Gulino continued:

> MR. GULINO: I learned the fact, and
> I've mentioned this to prior media
> outlets, that -- and that's why ***this***
> ***transparent process I'm vetting***
> ***candidates, I want to talk about issues***
> ***with the candidates.***

Transcript page 6, lines 10 to 15.

On January 16, 2015, a Lawrence E. Gilder was <u>still</u> a GULINO CANDIDATE for an interview for the open NY-11 Congressional Seat.  He was: (1) at least twenty-five years old; (2) has been a citizen of the United States for the past seven years; (3) would be (at the time of the election) an inhabitant of the State of New York and County of Richmond; and (4) a person who are interested in running.  However, at some time after the NY1 interview on January 16, based on Gilder, a Black Man's request to be considered for the job of U.S. Congressional Representative, Gulino's process was revealed to be something other than a "***TRANSPARENT PROCESS***."

On January 19, 2015, the Staten Island Advance published an article that stated:

> A week after saying he would interview all candidates
> interested in running for the open seat in Congress, Staten
> Island Democratic Chairman John Gulino has had a change

of heart, thanks to the entrance of a man [Mr. Gilder] who
has made it his mission to challenge the chairman.

A full copy of the January 19 Article is attached hereto as **Exhibit "D"**.  The Staten Island

Advance article continued:

> [Gilder] often sends Gulino letters, attacking the chairman
> and the committee, saying it is not inclusive, doesn't have
> enough candidates of color and doesn't represent the
> desires and needs of Democrats.
>
> Gilder believes Gulino should be removed as chairman and
> makes no bones about it when writing the committee leader.
>
> His most recent letter to the chairman expressed his interest
> in running for Congress against Republican DA Daniel
> Donovan.
>
> "I want to open up the democratic process so that the people
> have a fair and balanced opportunity for our community to
> vote for a qualified candidate," he said of his interest in the
> seat. "Not a hand-picked candidate."

No reason was given as to why Gulino's and the DCRC's stated "***TRANSPARENT***

***PROCESS***" was now ***magically amended***. Upon information and belief, **only** white

persons of European Descent were interviewed by Defendant GULINO to become the

Democratic Party's candidate in the May 5, 2015 Special Election for a shot at the job of

U.S. Representative, and these persons included:

a.    MICHAEL CUSICK

b.    MICHAEL E. McMAHON

c.    ROBERT HOLST

d.    LAURIE HONOR

e.    BILL COLTON

f.    BOB McKENNA

g.      VINCENT GENTILE

Gulino's and the DCRC's stated "***TRANSPARENT PROCESS***" was changed to exclude

the only Black, Colored and Native American person who expressed interest.

On January 19, 2015 and thereafter, Lawrence E. Gilder was a **NOT** a GULINO

CANDIDATE for an interview for the open NY-11 Congressional Seat.  He was: (1) at

least twenty-five years old; (2) has been a citizen of the United States for the past seven

years; (3) would be (at the time of the election) an inhabitant of the State of New York

and County of Richmond; and (4) a person who are interested in running, **BUT (5) Gilder**

**was also a Black, Colored and Native American person who expressed interest**.

The presumption must be that Gulino and the DCRC's reasons for not even

responding to Mr. Gilder's request for an interview were intentionally based on Mr.

Gilder's race, color and/or national origin.  The reason for this **race-based** change in

requirements was **NEVER** made public and requires fact discovery and depositions.

On January 30, 2015, induced by the fact that Defendant GULINO would interview

each individual expressing interest in running for the open Congressional Seat, Mr. Gilder

once again sent by certified mail and facsimile a letter expressing his interest in the NY-

11 Congressional Seat.  Defendant GULINO never responded to Mr. Gilder's letter dated

January 30, 2015.  See Complaint ¶¶ 97-98.

On February 11, 2015, induced by the fact that Defendant GULINO would interview

each individual expressing interest in running for the open Congressional Seat, Mr. Gilder

once again sent by facsimile a letter expressing his interest in the NY-11 Congressional

Seat.  Defendant GULINO never responded to Mr. Gilder's letter dated February 11,

2015.  See Complaint ¶¶ 97-98.

In Gulino and the DCRC's "***TRANSPARENT PROCESS"*** to select the Democratic Party's Candidate for Congress, at no time did either Gulino or the DCRC gave any availing (non-discriminatory) reason(s) why Gilder was not interviewed. In fact, Gulino and the DCRC flat-out ignored Mr. Gilder even though he met the Constitutional requirements for the Public Office, had engaged in Democratic Party and Political activism, had expressed interest to Gulino and the DCRC by multiple means and on multiple occasions when Gulino and the DCRC said that the process would be "open" and "transparent" and would be opened to everyone who expressed and interest. See Complaint ¶¶ 92 to 109. Moreover, Gilder's background and behavior are at least as good as if not better than others who had served in Congress. See Complaint ¶¶ 77 to 81. And as far as the NYCBOE is concerned, this fact was well-known in the public record. See Complaint ¶¶ 92 to 109. Gulino has a history of blatant and invidious discrimination as Party Leader of the DCRC. See Complaint ¶¶ 110 to 115.

Gulino and the DCRC's "***TRANSPARENT PROCESS"*** is, in reality code for something else – something willful, something intentional, something invidious, something racially-biased, something unconstitutional. Lawrence E. Gilder is African American, Black and Cherokee Indian.

The foregoing facts clearly give rise to Gilder's cognizable claims as against Gulino and the DCRC as to DISCRIMINATORY INTENT and DISCRIMINATORY EFFECT of totally ignoring and not even considering a black, African American man and member of the Cherokee nation for a chance at the job of United States Representative which sounds under the Fifteenth Amendment of the United States Constitution insofar as it relates to the franchise. See Complaint ¶ 4. The foregoing also give rise to cognizable claims

under: Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981");

Section 1983 of the Civil Rights Act of 1866, 42 U.S.C. § 1983 ("Section 1983"), Title VI

of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d et seq. ("Title VI"), Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII");

the New York State Human Rights Law, New York Executive Law § 290 et seq.

("NYSHRL"), and the New York City Human Rights Law, New York Administrative Code

§ 8-101 et seq. ("NYCHRL").  See Complaint ¶ 1.

As such, it will be necessary to have discovery and depose _at least_ these persons

to understand Gulino and the DCRC's "***TRANSPARENT PROCESS***" and the full facts

surrounding the violations of Mr. Gilder's rights:

- JOHN P. GULINO

- TOM FEENEY, JR.

- KEVIN ELKINS

- MICHAEL CUSICK

- MICHAEL E. McMAHON

- ROBERT HOLST

- LAURIE HONOR

- BILL COLTON

- VINCENT GENTILE

- BOB McKENNA

- CHARLES J. RAGUSA

## The Relationship between Gulino / DCRC's activities and the NYCBOE

The NYCBOE, who knew or should have known about Gulino and the DCRC's _**"TRANSPARENT PROCESS"**_, willfully and/or wantonly "rubber-stamped" the certification of Gulino's hand-picked candidate, or the NYCDOE did so intentionally, in willful violation of the applicable law.  The NYCBOE is a governmental agency of the City of New York and receives Federal Funding through the City of New York and through the New York State Board of Elections.  See Complaint ¶ 31.

In addition to the factual backdrop detailed _infra._, that was part of the public record and that squarely concerns ELECTIONS, it would seem unlikely and implausible if the NYCBOE has no awareness of the situation whatsoever – especially the Executive Director Michael Ryan and the Staten Island Director Sheila Del Giorno – both of whom live on Staten Island.  The presumption must be that there is obvious and apparaent awareness.

Couple that presumption with the fact that the NYCBOE Executive Director Michael Ryan is a long-time Staten Island Democratic Party Official.  Ryan was hand-selected by Gulino to be the District Attorney Candidate on Staten Island in 2007 and again in 2011.  NYCBOE Staten Island Director Sheila Del Giorno is also a Democratic Party Official and many believe her son, Lobbyist and DCRC Member Jon Del Giorno to be one of the most influential men in the City of New York and with DCRC Chairman John Gulino.  See **Exhibit "E"** attached to the Declaration.  A candidate backed by the DCRC in 2001 himself, Jon Del Giorno's firm has worked extensively for the DCRC and its candidates in the past.  See **Exhibit "F"** attached to the Declaration.  The question raised must be factually scrutinized through discovery: how and to what extent did these individuals

14

interact with respect to Gilder, Gulino, the DCRC and the NY-11 Special Election – particularly after it was made public that Gilder wanted to interview to run for Congress and Gulino and the DCRC "magically" and intentionally changed their seeming "open door" requirements to be considered for the chance at the job of United States Representative on the Democratic Party line.

Moreover, the NYCBOE is zealously defended by a legal team led by STEVEN RICHMAN.  There is great emphasis placed on anti-discrimination at the NYCBOE, as is detailed in numerous places including in the Personnel Guidelines, attached to the Declaration as **Exhibit "G"** and available at: http://vote.nyc.ny.us/downloads/pdf/policiesandprocedures.pdf.

With respect to dealing with all persons, including the general public, the Personnel Guidelines state:

> We should be cognizant of the fact that we deal with a wide diversity of people daily. It is a mandate upon us all that we give total respect to all; whether general public, or fellow agency employees. There will be no tolerance for discrimination or other direct violation of this mandate.  (F-16)

And again the Personnel Guidelines state:

EQUAL EMPLOYMENT OPPORTUNITY

The Board of Elections is an Equal Employment Opportunity Employer. The Board of Elections is strongly committed to maintain fair employment practices for all of its employees. Federal, State and local laws prohibit employment discrimination based on:

| | |
|---|---|
| °Age | °National Origin |
| °Marital Status | °Color |
| °Alienage | °Race |

°Creed

°Religion

°Disability

°Sexual Orientation

°Gender

These laws prohibit discrimination that affects:

°Hiring

°Training

°Assignment

°Transfer

°Working Conditions

°Discipline

°Salary

°Termination

°Evaluation

°Any other terms and conditions

°Promotion of employment

The law requires that reasonable accommodations be made for employees with disabilities. The law also requires that reasonable accommodations be made for employees' religious observance. All employees are directed to comply with both the letter and the spirit of these laws. (G-2 to G-3).

And again the Personnel Guidelines state:

Filing a Charge With the EEOC If you believe you have been discriminated against by an employer, labor union or employment agency when applying for a job or while on the job because of your race, color, sex, religion, national origin, age, or disability, or believe that you have been discriminated against because of opposing a prohibited practice or participating in an equal employment opportunity matter, you may file a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC). (G-7)

The NYCBOE and its key employees admitted that it had accepted the Democratic Party, Kings & Richmond Counties, 11th Congressional District, Certificate of Party Nomination and Certificate of Consent and Acceptance (attached to the Declaration as **Exhibit "H"**) which was attached in support of the Motion to Dismiss by the NYCBOE.

16

Insofar as the NYCBOE 1) is charged with the verification / validation of candidates for ballot access and that the same is done with respect to applicable law, 2) had notice of John Gulino's ***"TRANSPARENT PROCESS"*** with respect to the selection of the candidate for the NY-11 Congressional District in the Public Record, 3) had notice of

As such, it will be necessary to have discovery and depose *at least* these persons to understand how the NYCBOE "rubber-stamped" Gulino's "***TRANSPARENT PROCESS"*** and the full facts surrounding the violations of Mr. Gilder's rights:

- NYCBOE Executive Director Michael Ryan

- NYCBOE General Counsel Steven Richman

- NYCBOE Staten Island Director Sheila Del Giorno

- Lobbyist and DCRC Member Jon Del Giorno

- NYCBOE Commissioners

## LEGAL ARGUMENT

### A. Procedural Points

#### 1. The Legal Standard for Fact Discovery to Commence: Plaintiff Gilder has Stated Cognizable Claims

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is weighted in favor of the plaintiff. "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." _Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991)_. The court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. _California Motor Transp. Co, v. Trucking Unlimited_, 404 U.S. 508, 515, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972).

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiffs obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." _Bell Atlantic Corp. v. Twombly_, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." Id. At 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." _Ashcroft v, Iqbal_, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citing _Twombly_. 550 U.S. at 556). The plausibility standard is

not akin to a 'probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. _Jones v. Harris_, 665 F.Supp.2d 384, 393 (SDNY 2009).

Here, as will be more fully fleshed out _infra._, Gilder has advanced several plausible legal theories of liability and bases for recovery supported by a Complaint with documentary evidence attached therewith as well as additional documentary evidence appended to the Declaration herewith in opposition to the motion to dismiss, all of which show a cognizable claims that Gulino, DCRC, the NYCBOE and as of yet unidentified others acted while as state actors with the color of law and willfully and/ or wantonly invidiously discriminated as against Mr. Gilder and his right to ballot access and chance at the job of United States Congressman for New York's 11th Congressional District.  Mr. Gilder should be afforded discovery so he may be more fully able to explore and develop the factual bases for his legal claims and redress the clear violations of his civil right.


2. **Jurisdictional Prerequisites**

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's civil rights under the federal constitution, 42 U.S.C. § 2000d (Title VI), 42 U.S.C. § 2000e (Title VII), Section 1981 and Section 1983. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

The Plaintiff has complied and/or substantially complied with all of the jurisdictional predicates, and such compliance and the access to the courts with a patently cognizable claim should be balanced against the well-established principle that when hurt or injury is inflicted on racial minorities by the encouragement or command of laws or other state action, the Constitution requires redress by the courts.  See Complaint ¶¶ 71 to 76.  See *Johnson v. California*, 543 U.S. 499, 511-512, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005) ("[S]earching judicial review . . . is necessary to guard against invidious discrimination"); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991) ("Racial discrimination" is "invidious in all contexts").

### 3.  **Purported Immunity Arguments**

Gulino, DCRC and the NYCBOE may advance immunity arguments.  All of these arguments are unavailing at the motion to dismiss phase of the litigation.

In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), the United States Supreme Court indicated that the availability of qualified immunity ought to be decided by the Court at the earliest possible opportunity —preferably at the outset of the case, which is a point at which plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial. Thus, as the Second Circuit explained in *Stephenson v. John Doe. Detective*, 332 F.3d 68 (2d Cir. 2003), when determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts is presumed to be true, and the question to be answered is whether a reasonable Government officer, confronted with the facts as

20

alleged by plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right.

The inquiry is a two-step one, although the Supreme Court has recently given courts permission to ask the questions in whatever order seems most appropriate. The court must determine: (1) whether, taking the facts in the light most favorable to the party asserting the injury, a constitutional infraction was committed. *Saucier*, 533 U.S. at 201, and (2) whether a reasonable official in defendant's position (as that position is described by plaintiff) ought to have known that he was violating plaintiff's constitutional rights by doing what plaintiff alleges he did, Ordinarily, the relevant inquiry will be whether the law is in fact well-settled—because if it is, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

Claims that a public officer made a reasonable mistake of fact "go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity." *Stephenson*, 332 F.3d at 78 (citing *Saucier*, 533 U.S. at 205-206). Moreover, Gulino and NYCBOE General Counsel STEVEN RICHMAN are excellent and seasoned attorneys admitted to practice law in the courts of the State of New York and in the United States Court for the Eastern District of New York for many years. They know or should be presumed to know the law.

Moreover, it is no defense to a claim of qualified immunity that the defendant did not do what plaintiff said he did. At this early stage of a lawsuit, before discovery takes place, we are presuming that the plaintiff's version of events is true, so a court cannot

21

take into account assertions by the accused officer that contradict the plaintiffs allegations. Nothing in _Saucier_ can be read to deprive the plaintiff of his Seventh Amendment right to have a jury resolve all disputed issues of material fact. If plaintiff's version of the facts is wrong and defendant's is correct, then the defendant will prevail, not on the ground of qualified immunity, but because he did nothing wrong. _Jones v Harris_, 665 F.Supp.2d 384, 394 (SDNY 2009).

### B. Substantive Points of Law

#### 1. United States Representative is a Job

The position of United States Representative is a job. According to the Congressional Research Service, the salary for a United States Representative is $174,000.00, and the same is subject to income taxation. See **Exhibit "I"** attached to the Declaration available at: http://library.clerk.house.gov/reference-files/114_20150106_Salary.pdf. The United States House of Representatives is an equal-opportunity employer. See **Exhibit "J"** attached to the Declaration available at http://www.house.gov/content/jobs/.

Article I, Section 2 of the United States Constitution sets three qualifications for representatives. Each representative must: (1) be at least twenty-five years old; (2) have been a citizen of the United States for the past seven years; and (3) be (at the time of the election) an inhabitant of the state they represent.

#### 2. United States Representative is a Job and Ballot Access in New York is a Pre-Requisite

#### A. The Special Election under New York Law

The election for United States Representative at issue is a "Special Election" under New York Election law. Effective on January 5, 2015, Congressman Michael G. Grimm

resigned his seat as U.S. Representative for New York's 11th Congressional District (NY-11). Continuing his pattern of political activism, Mr. Gilder joined a lawsuit to compel the New York Governor (the "Executive Authority") to set a date for the Special Election to fill the vacancy in New York's 11th Congressional District (NY-11). See Complaint ¶ 59.

The United States Constitution states:

> When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.  U.S. Const. Art. I, § 2, Cl 4.

The Governor of New York had a mandatory duty under U.S. Const. Art. I, § 2, cl. 4 to proclaim a special election to fill a vacancy in the United States House of Representatives. The Governor's proclamation of a Special Election must be made consistent with N.Y. Pub. Off. Law § 42 which states:

> A special election shall not be held to fill a vacancy in the office of a representative in congress unless such vacancy occurs on or before the first day of July of the last year of the term of office, or unless it occurs thereafter and a special session of congress is called to meet before the next general election, or be called after September nineteenth of such year; nor to fill a vacancy in the office of state senator or in the office of member of assembly, unless the vacancy occurs before the first day of April of the last year of the term of office, or unless the vacancy occurs in either such office of senator or member of assembly after such first day of April and a special session of the legislature be called to meet between such first day of April and the next general election or be called after September nineteenth in such year. If a special election to fill an office shall not be held as required by law, the office shall be filled at the next general election.

Under the New York Election Law § 6-114, Party nominations for an office to be filled at a *special election* for U.S. Representative shall be made in the manner prescribed by the rules of the party.  Under the New York Election Law § 6-114, Party nominations for an

office to be filled at a *special election* for U.S. Representative <u>cannot</u> be accomplished by the petitioning process to obtain ballot access.

The Rules of the Democratic Party of the State of New York, ARTICLE VI, Section 2(a)(iii) state [*in pertinent part*]:

> (iii)    Nominations for an office to be filled at a special election, nominations for election to fill a vacancy, or nominations to fill a vacancy in a nomination, shall be made:
>
> (iii) if for an office in any other political subdivision of the State, then by the district or party committee thereof…

The Rules of the Democratic Party of the State of New York, Article II, Section 3(a)(ii) state:

> If a political subdivision consists of more than one county, then the district or party committee for such subdivision shall be composed of the Chair of the County Committees of the various counties, or parts of counties, situated within the political subdivisions.

New York's 11th Congressional District (NY-11) is a <u>congressional district</u> for the <u>United States House of Representatives</u> in <u>New York City</u>.  The NY-11 district includes all of <u>Staten Island</u> and parts of southern <u>Brooklyn</u>, including the neighborhoods of <u>Bay Ridge</u>, <u>Bensonhurst</u>, <u>Dyker Heights</u>, and <u>Gravesend</u>.

Defendant Gulino is the elected political party leader of the Democratic Party in Richmond County, New York, and at all relevant times, is and was a "local officer" as that term is defined under the New York State Public Officers Law.  See NY CLS Pub O § 2.

In the May 5, 2015 Special Election for the Congressional Seat in NY-11, the candidates were chosen, pursuant to the Rules of the Democratic Party of the State of New York, by the Democratic Chairs of the County Committees of the various counties of

Kings and Richmond, in this case Charles J. Ragusa in Brooklyn and Defendant John Gulino in Staten Island.

At all relevant times, Defendant John Gulino was the *de facto* selector of the Democratic Party's candidate in the May 5, 2015 Special Election for the Congressional Seat in NY-11, as was made evident in his January 16 interview with NY1.[1]  See Transcript page 4 lines 2 to 11.  Moreover, at all relevant times, Defendant John Gulino was the *de facto* selector of the Democratic Party's candidate in the May 5, 2015 Special Election for the Congressional Seat in NY-11, because in the history, custom and practice, the choice is deferred to the County Leader who comprises the larger portion of the district or political subdivision.

As was detailed above and in the Complaint, the ***"TRANSPARENT PROCESS"*** was used by state actors under the color of law to exclude Mr. Gilder from the opportunity to become a United States Representative because Guilder was intentionally ignored and never interviewed because of the color of his skin.

---

[1] [A]t the present time, the process that I'm conducting, as I've indicated to many people, is a very ***transparent process***. ***As opposed to saying, okay, this is my candidate, and I have that power to do so, I have decided that we need a much more transparent process***, especially in light of the fact that I think who represents the people of Staten Island in Congress is extremely, extremely important.

**B. The First Amendment Associational Rights of Political Parties Are Strong But Not Without Limits: *N.Y. State Bd. of Elections v. Lopez Torres*, 552 US 196 (2008) – Scalia Opinion**

Much of this case will turn on the interpretation of the United States Supreme Court's Opinion in <u>N.Y. State Bd. of Elections v Lopez Torres</u>, 552 US 196 (2008).  In that case, which involved a Judicial Election in New York State, Lopez Torres contested that process by which judicial candidates were selected: through a petition process for delegates to a judicial convention that ultimately selected the judicial candidate(s) was a violation of Lopez Torres' constitutional ballot access rights.  The Supreme Court ultimately disagreed.  However, the instant matter is one that falls within the ambit of an unconsidered circumstance of the New York Election Law framework – a Special Election where there is no party petitioning process and Party Officials act with the color of law in order to select a candidate pursuant to applicable law.[2]  Such a circumstance was alluded to by Justice Kennedy in his Concurring Opinion, discussed below.

Justice Scalia delivered the Opinion of the Court, which stated in pertinent part **emphasis added]**:

> [A] political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform, are limited when the State gives the party a role in the election process—as New York has done here by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot.  **Then, for example, the party's racially**

---

[2] Especially with the heightened standard that Gulino and the DCRC created in their ***"TRANSPARENT PROCESS"*** – made clear in the press and the public record - of which the NYCBOE was aware and was either wantonly disregarded or willfully and intentionally ignored in their certification of Gulino's candidate on any number of improper, biased and invidious bases.

**discriminatory action may become state action that violates the Fifteenth Amendment.** *California Democratic Party v. Jones*, 530 U.S. 567, 574-575, 120 S. Ct. 2402, 147 L. Ed. 2d 502 (2000).   And then also the State acquires a legitimate governmental interest in ensuring the fairness of the party's nominating process, enabling it to prescribe what that process must be. *Id.*, at 572-573, 120 S. Ct. 2402, 147 L. Ed. 2d 502.

C.  **The New York Special Election and NO PETITIONING PROCESS: The Kennedy Concurrence**

New York State Election has a second mechanism for placement on the <u>General election</u> ballot in elections aside from the <u>Special election</u> Political Party-Selection Ballot Access method:

> One who seeks to be a candidate in New York may qualify by a petition process, and this petition alternative changes the analysis.  *N.Y. State Bd. of Elections v Lopez Torres*, 552 US 196, 211 (2008).

**Here, there was no petition process.**   Because it was a Special Election, the candidate was hand-picked by John Gulino's "***TRANSPARENT PROCESS***", <u>by his own admission in the NY1 interview</u>, by operation of the New York State law.  This means that Lawrence E. Gilder was intentionally disregarded and discriminated against and not given an interview for the job of U.S. Representative and no interview and/or due consideration of his candidacy and ballot access because of his race, color and / or national origin.

3.  **The Challenge Against the New York Special Election Scheme: Who watches the Watchmen?**

*N.Y. State Bd. of Elections v Lopez Torres* stands for the proposition that a political party has a right to limit its membership and engage in protected associational activity.

27

But protections of a political party's First Amendment associational activities have limits. These protections <u>do not</u> extend to intentional and invidious discriminatory action by a political party that is also state action.  The following hypotheticals will help to distill the issues.

A.  **Hypothetical #1 - George Gypsy and the NYS KKK Party Local General Election**

Under the framework of New York Election Law, the hypothetically formed "Klu Klux Klan Party" (NYS KKK Party) has achieved ballot status by securing 50,000 or more votes for its candidate for Governor pursuant to N.Y. Elec. Law Article 2 and completing all of the requisite state law formalities, e.g. §2-112.  The other major party relevant to Blanco County (a fictional New York State county) is the NYS Pink Party.  The NYS KKK Party and the NYS Pink Party are two majority parties  the Now the NYS KKK Party could operate on an entirely racist basis and seeks to develop, promote and cultivate candidates that are not Black and / or Jewish and/ or Gypsies, etc., and that NYS KKK Party would receive Constitutional Protection of its First Amendment Associational Rights. Let's say the NYS KKK Party forms a local County Committee in fictional Blanco County, New York.

Now George Gypsy becomes a registered and is an enrolled member of the NYS KKK Party in Blanco County, New York.  George Gypsy wants to seek the local NYS KKK Party's nomination for the Public Office of United States Representative in a General Election.   George Gypsy calls Dill Weed, the local NYS KKK Party Blanco County Chairperson (duly elected by the County Committee Members of the local Blanco County NYS KKK Party County Committee) (or the NYS KKK Party Committee designated by the NYS KKK Party State Committee).  George Gypsy sends letters, sends faxes – but none

28

of his communications are returned by Dill Weed, who the County Chairperson / Committee.  George Gypsy feels aggrieved.  The local Blanco County NYS KKK Party Chairman, Dill Weed, nominates George Green (fictional) for the ballot spot, petitions are collected and George Green qualifies to be placed on the ballot.  George Gypsy claims that he was denied ballot access.  He says he didn't get a "fair shot".

Under _N.Y. State Bd. of Elections v Lopez Torres_, George Gypsy has no claim. Why?  Because he could have collected petition signatures to gain Ballot Access to the NYS KKK Party's Primary Election Ballot in Blanco County.  Even Blanco County's Board of Elections (or the City Blanco County's Board of Elections is in) can be secure in the fact of the NYS KKK Party and the local party's activities.  The only state actor here was the Blanco Board of Elections, who performed its legal task of certifying the proper petition signatures were collected to properly place the selected NYS KKK Party candidate on the ballot.

As Justice Scalia stated in the opinion of the Court in _N.Y. State Bd. of Elections v Lopez Torres_, 552 U.S. 196, 205-206 (2008):

> To be sure, we have, as described above, permitted States to set their faces against "party bosses" by requiring party-candidate selection through processes more favorable to insurgents, such as primaries. But to say that the State can require this is a far cry from saying that the Constitution demands it. None of our cases establishes an individual's constitutional right to have a "fair shot" at winning the party's nomination. And with good reason. What constitutes a "fair shot" is a reasonable enough question for legislative judgment, which we will accept so long as it does not too much infringe upon the party's associational rights. But it is hardly a manageable constitutional question for judges--especially for judges in our legal system, where traditional electoral practice gives no hint of even the existence, much less the content, of a constitutional requirement for a "fair shot" at party nomination. Party conventions, with their

> attendant "smoke-filled rooms" and domination by party
> leaders, have long been an accepted manner of selecting
> party candidates. "National party conventions prior to 1972
> were generally under the control of state party leaders" who
> determined the votes of state delegates. American
> Presidential Elections: Process, Policy, and Political Change
> 14 (H. Schantz ed. 1996). Selection by convention has never
> been thought unconstitutional, even when the delegates were
> not selected by primary but by party caucuses.

The United States Courts are not concerned with a "fair shot" in the elections of the States, or in Justice Scalia's language: "The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference. It does not call on the federal courts to manage the market by preventing too many buyers from settling upon a single product." _N.Y. State Bd. of Elections v. Lopez Torres_, 552 US 196, 198 (2008).

### B. **Hypothetical #2 - George Gypsy and the NYS KKK Party Local Special Election**

Same hypothetical world as in Hypothetical #1, except that now long-time fictional NYS Pink Party Member and United States Representative Otto Lane (fictional) has died suddenly after being impaled on a giant Bratwürst at the dedication of a new Biergarten in the City of Germantown in Blanco County, New York.  Again, George Gypsy wants to seek the local NYS KKK Party's nomination for the Public Office of United States Representative in a Special Election duly called by the Governor to fill the seat left vacant by the death of Otto Lane under the applicable framework discussed _supra_.  In this case, George Gypsy calls the Blanco local NYS KKK Party Blanco County Chairperson Dill Weed, the applicable selector under New York Election Law § 6-114 and NYS KKK Party

30

State Rules. George Gypsy sends letters, sends faxes – but none of his communications are returned by Dill Weed, the County Chairperson / the New York Election Law § 6-116 selector. The local Blanco County NYS KKK Party Chairman, Dill Weed, nominates George Green for the ballot spot, timely files the proper Certificate of Party Nomination and Certificate of Consent and Acceptance and George Green is on the ballot. George Gypsy feels aggrieved. George Gypsy claims that he was denied ballot access. George Gypsy says he didn't get a "fair shot".

Under *N.Y. State Bd. of Elections v. Lopez Torres*, George Gypsy still has no claim. Even though the Blanco local NYS KKK Party Blanco County Chairperson, the applicable selector under New York Election Law § 6-114 and NYS KKK Party State Rules, is fulfilling an official state function in the selection of the candidate AND there is no petition process to get on the ballot on the NYS KKK Party line, there is no claim because George Gypsy's not getting a "fair shot" with the NYS KKK Party is not actionable. Blanco County's Board of Elections (or the City Blanco County's Board of Elections is in) can be secure in the fact of the NYS KKK Party and the local party's activities. The Blanco Board of Elections performed its legal task of certifying the proper Certificate of Party Nomination and Certificate of Consent and Acceptance[3] to properly place the selected NYS KKK

---

[3] The question becomes, at what point under New York Election Law § 6-116 does a Certificate of Party Nomination and Certificate of Consent and Acceptance require language to the effect that the New York Election Law § 6-114 selector or committee has discharged its responsibility in accordance with applicable law? Does a Board of Elections in New York State have an obligation to seek certification that a political party official / committee has acted in accordance with applicable law, including that political party official / committee has not intentionally engaged in invidious discrimination in the Special Election candidate selection process? Put another way, in a Special Election does a Board of Elections in New York State have a responsibility to "cover-off" a political party's candidate selection candidate process to ensure legal compliance with applicable law at the point where the protection of the political party's First Amendment associational rights end under *N.Y. State Bd. of Elections v. Lopez Torres*?

Party candidate on the ballot were validly executed and timely filed under the currently-valid New York Election Law (which may itself be problematic).

## C. **Hypothetical #3 - Greta Gypsy and the NYS KKK Party Local Special Election -  Take 2**

Same hypothetical world as in Hypothetical #2.  Long-time fictional NYS Pink Party Member and United States Representative Otto Lane has died suddenly after being impaled on a giant Bratwürst at the dedication of a new Biergarten in the City of Germantown in Blanco County, New York.  Greta Gypsy is a registered and enrolled member of the NYS KKK Party in Blanco County, New York.  A Special Election for the Public Office of United States Representative is duly called by the Governor to fill the seat left vacant by the death of Otto Lane under the applicable legal framework discussed *supra*.  Greta Gypsy is a political "gadfly".  She has a history of writing letters to local Blanco County NYS KKK Party Chairman, Dill Weed stating that the local Blanco County NYS KKK Party should be more inclusive and should open up to new ideas and new non-"lily-white" people, including individuals of Gypsy ethnicity and national origin like herself. Greta Gypsy formed her own local NYS KKK Party group focused on party reform and has even helped previous Blanco County NYS KKK Party candidate get elected by distributing literature, putting up lawn signs, and attending functions.

Local NYS KKK Party Blanco County Chairperson Dill Weed immediately injects himself into the media soon after the Special Election is called.  Dill Weed attacks the local Pink Party for being non-inclusive in their selection process and announcing that it will not consider those Pink Party members without some previous public office

experience.  In fact, the Pink Party selected their candidate behind closed doors, and its Executive Committee and County Committee "rubber stamped" the Pink Party candidate Wilma Willows (fictional) in the manner proscribed by the NYS Election Law and the NYS Pink Party Rules.  No, Dill Weed would not let the Pink Party off the hook and goes on a media barrage.  Dill Weed tells the local Blanco Daily Blotter: "I'm not like the Pink Party. I am old fashioned and I will interview anyone who expresses interest – elected official or not."

The next day, Greta Gypsy reads the local Blanco Daily Blotter and, induced by Dill Weed's statements, now wants an interview to seek the local NYS KKK Party's nomination for a shot at the job of the Public Office of United States Representative, which pays $174,000.00, which isn't too shabby.  That day, Greta Gypsy tries to reach out to Dill Weed, but he was unavailable.  Dill Weed was on "Blanco News First Channel" talking about how bad the Pink Party's selection process was for the Special Election and talking up the NYS KKK Party and its process and confirming to the host and the audience that he, Dill Weed, is the applicable selector under New York Election Law § 6-114 and NYS KKK Party State Rules: "I could have just chosen someone like the Pink Party did, and I have that power.  But instead, we will have a process open to all members of the NYS KKK Party."

Greta Gypsy sends letters, sends faxes – and her communications are answered by Dill Weed, the County Chairperson / the New York Election Law § 6-116 selector and the person who claimed in the press that Dill Weed has the power of selection.  Dill Weed's letter to Greta Gypsy was sent the next week and reads:

33

Dear Greta,

We regret to inform you that we are not considering your candidacy at this time because of your arrest in 2004 for violation of local Germantown Ordinance 103: Selling Strudel without a license.  We do not believe local Blanco County voters will react kindly to that revelation on Election Day and we have the party's interests to consider.  Maybe another time.

Dill Weed, Chairman, Blanco County KKK Party

The local Blanco County NYS KKK Party Chairman, Dill Weed, nominates George Green for the ballot spot, petitions are collected and George Green is on the ballot.  Greta Gypsy feels aggrieved.  She claims that he was denied ballot access.  She says: "Dill Weed didn't consider me because I am of Gypsy Ethnicity and of Gypsy National Origin.

Greta Gypsy files a complaint with the EEOC because she wanted that job as Congresswoman for the District covering Blanco County.  The EEOC sends back a "No-Action" letter.  Greta Gypsy then files a simple complaint in the US District Court with jurisdiction over Blanco County, New York alleging miscellaneous violations of law related to Dill Weed's and the local NYS KKK Party's invidious discrimination concerning her Fifteenth Amendment rights and various additional Federal and State law claims regarding invidious intentional discrimination based on her race.

Under _N.Y. State Bd. of Elections v Lopez Torres_, Greta Gypsy may have a claim. All of this will depend on whether or not Dill Weed and the local Blanco County NYS KKK Party intentionally engaged in intentional invidious discrimination.   Dill Weed, the applicable selector under New York Election Law § 6-114 and NYS KKK Party State Rules, is fulfilling an official state function in the selection of the candidate AND there is no petition process to get on the ballot on the NYS KKK Party line, but Dill Weed provided

34

a clear non-invidious discriminatory rational reason to Greta Gypsy as to why she was not given an opportunity at the ballot spot.  There would have to be clear allegations of discriminatory intent and the facts as plead in the complaint would have to pass muster under the *Arlington Heights* standard to survive a 12(b)(6) motion to dismiss, particularly in the face of the letter from Dill Weed expressing a non-discriminatory reason for the political party's decision.

On these facts, Blanco County's Board of Elections (or the City Blanco County's Board of Elections is in) may not be secure in the fact that the NYS KKK Party and the local party's activities have been done in compliance with the law.  The Blanco Board of Elections performed its legal task of certifying a Certificate of Party Nomination and Certificate of Consent and Acceptance to properly place the selected NYS KKK Party candidate on the ballot were validly executed and timely filed, but are additional requirements necessary to ensure that the Certificate of Party Nomination and Certificate of Consent and Acceptance complies with *N.Y. State Bd. of Elections v Lopez Torres?*

Under this hypothetical, was an obligation triggered by Dill Weed's public statement: "I could have just chosen someone like the Pink Party did, and I have that power.  But instead, we will have a process open to all members of the NYS KKK Party", coupled with the real possibility for invidious discrimination and pretext.

The question becomes, at what point under New York Election Law § 6-116 does a Certificate of Party Nomination and Certificate of Consent and Acceptance require additional language to the effect that the New York Election Law § 6-114 selector or committee has discharged its responsibility in accordance with applicable law – specifically in compliance with due process, equal protection and in cognizance of all

35

rights and obligations under the State and Federal Constitution in the Special Election

Candidate Section process?  Does a Board of Elections in New York State have an

affirmative obligation to seek additional certification that a political party official /

committee has acted in accordance with applicable law, including that political party

official / committee has not intentionally engaged in invidious discrimination in the Special

Election candidate selection process?  Put another way, in a Special Election does a

Board of Elections in New York State have a responsibility to "cover-off" a political party's

candidate selection candidate process to ensure legal compliance with applicable law at

the point where the protection of the political party's First Amendment associational rights

end under _N.Y. State Bd. of Elections v. Lopez Torres_?


**D. The Case at Issue: Gulino, the DCRC and the NYCBOE Go MUCH Further Than Their Hypothetical Counterparts in Fictional Blanco County**


Unlike the fictional NYS KKK Party, the Democratic Party guarantees it does not

engage in invidious discrimination under the rules of the Democratic National Committee

and the New York State Democratic Committee.  Gulino's statements about his and the

DCRC's **_"TRANSPARENT PROCESS"_** and the "magical" (pretextual) change of policy

for the NY-11 Special Election spot once Gilder expressed his desire to run are

intentionally motivated by invidious discrimination – or at least a cognizable showing has

clearly been made.  Gulino and the DCRC only interviewed white persons of European

descent for a shot at the Democratic Party's NY-11 Special Election Ballot line, even in

the face of requests by a Black community activist to whom due consideration was

promised in the public record by virtue of his being a registered and enrolled member of

36

the Democratic Party in Richmond County – and Gilder was intentionally denied BECAUSE of invidious discriminatory and biased reasons.  And this fact is rendered even more problematic because unlike the hypothetical KKK Party, the Democratic Party – the political party of FDR, JFK, LBJ, Obama and Clinton – has a stated commitment to a policy of anti-discrimination based upon race, gender, color, national origin, age, sexual orientation, gender identity and disability.  The Democratic Party has historically been the "big tent" but the actions of Gulino and the DCRC now serve to signal: "Coloreds Need Not Apply" – at least in Richmond County, New York.

The NYCBOE's involvement is problematic in two important ways.  First is the incestuous political relationship between the NYCBOE and Gulino / the DCRC as alleged in the Complaint and the supporting documents.  Based on the allegations in the Complaint and supporting documentation, it appears cognizable that the NYCBOE is party to Gulino and the DCRC's intentional and invidious discrimination.  The allegation is that the application of a facially neutral New York State Election Law statutory framework in the context of a Special Election was rendered discriminatory by state actors at the NYCBOE.  But the second problem is that the New York State Election Law statutory framework in the context of a Special Election is not facially neutral – and that point is made clear by these facts.  The statutory framework does not take into account a scenario where the associational rights of political parties end and due process and equal protection rights are triggered – and on that basis, the Special Election framework under the New York State Election Law is unconstitutional based on a "less direct" bias.

Put quite simply, who watches the watchmen if not one of the firmest pillars of our United States Constitution – the obligation of our institutions to embrace equal protection

37

of the laws and avoid intentional invidious discrimination in state action taken under the color of law?  See Justice Sotomayor's dissent in _Schuette_, infra.

4. **The _"TRANSPARENT PROCESS"_ Of Intentional Invidious Race-Based Discrimination By A Government Actor: The _Arlington Heights_ Factors**

A. **Equal Protection From Willful and/or Wanton Invidious Discrimination Is Gilder's Personal Right**

The Equal Protection Clause of the Fifth and Fourteenth Amendments protect a personal right." _Adarand Constructors, Inc._ v. _Peña_, 515 U.S. 200, 224, 230, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995). It is a "basic principle that the Fifth and Fourteenth Amendments to the Constitution protect _persons_, not _groups_." _Id._, at 227, 115 S. Ct. 2097, 132 L. Ed. 2d 158.

B. **A Violation of Equal Protection Requires State Action Motivated By Discriminatory Intent and the Cognizable Conduct Alleged By the Plaintiff in the Complaint Is INTENTIONAL Invidious Discrimination**

"Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." _Plessy v. Ferguson_, 163 U.S. 537, 559, 16 S. Ct. 1138, 41 L. Ed. 256 (1896) (dissenting opinion).

A violation of the Equal Protection Clause requires state action motivated by discriminatory intent," _Hernandez v. New York_, 500 U.S. 352, 372-373, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (O'Connor, J., concurring in judgment), and that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact," _Arlington Heights v. Metropolitan Housing Development Corp._, 429 U.S. 252, 264-265, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) [_Arlington Heights_].

In the present case, had Gulino and the DCRC not injected the _**"TRANSPARENT PROCESS"**_ into the public record and then "pulled the rug out" from the same

**"TRANSPARENT PROCESS"** when Gilder stated his intentions to run – communicated unequivocally to Gulino and the DCRC and received- and yet Gilder was totally ignored while the white individuals of European Descent were granted an interview and audience with Gulino and the DCRC, we would not be at the courthouse steps.  The cognizable "intentionality" of Gulino's and DCRC's invidious discrimination is ascertained clearly by Gulino's own statements about the **"TRANSPARENT PROCESS"** and then Gulino and the DCRC's failure to interview Gilder AND failure to provide any non-discriminatory reason in the face of the interviews of white individuals of European Descent.  The cognizable "intentionality" of the NYCBOE's invidious discrimination is ascertained by Gulino's and the DCRC's inexorable connection to the NYCBOE and the allegations of *de facto* control and/or influence coupled with a failure ("willful blindness" / "wantonness") of the NYCBOE to fulfill its core function with respect to the submitted Certificate of Party Nomination – to certify that the process by which the selection was made complies with applicable law – including the U.S Constitution and its mandates as against intentional invidious discrimination – in the face of Gulino and the DCRC's **"TRANSPARENT PROCESS"** – which no NYCBOE official tasked as a watchdog of the Staten Island elections and ballot access process can say was not injected into the public record.

Additionally, let a misnomer of the Gulino Defendants' papers be corrected immediately.  INTENTIONAL invidious discrimination has been plead here.  The word "WILLFUL" is clearly used in PARAGRAPH 3 of the Complaint and applies to all cognizable claims which may be asserted as against the Defendants **[emphasis added]**:

> 3.    Defendants' conduct was knowing, malicious, **willful** and **wanton** and/or showed a reckless disregard for Plaintiff, which has caused and continues to cause Plaintiff to suffer substantial    economic    and    non-economic    damages,

39

permanent harm to his professional and personal reputation, and severe mental anguish and emotional distress. Attorneys' fees and punitive damages are available in addition to compensatory damages and declaratory and injunctive relief.

Black's Law Dictionary (8th Edition) defines the term "WILLFUL" as follows *[emphasis added]*:

Willful, adj., Voluntary and *__intentional__*, but not necessarily malicious. – Sometimes spelled willful. Cf. WANTON.

Black's Law Dictionary (8th Edition) defines the term "WANTON" as follows:

Wanton, adj. Unreasonably or maliciously risking harm while being utterly indifferent to the consequences. In criminal law, wanton usu. connotes malice (in the criminal law sense), while *reckless* does not. Cf. RECKLESS; WILLFUL.

Black's Law Dictionary (8th Edition) defines the term "WANTONNESS" as follows:

Wantonness, n. Conduct indicating that the actor is aware of the risks but indifferent to the results. Wantonness usu. suggests a greater degree of culpability than recklessness, and it often connotes malice in criminal-law contexts.

Black's Law Dictionary (8th Edition) defines the term "WILLFUL BLINDNESS" as follows *[emphasis added]*:

Willful blindness. Deliberate avoidance of knowledge of a crime, esp. by failing to make a reasonable inquiry about suspected wrongdoing despite being aware that it is highly probable. A person acts with willful blindness, for example, by deliberately refusing to look inside an unmarked package after being paid by a known drug dealer to deliver it. Willful blindness creates an inference of knowledge of the crime in question.

The cognizable conduct alleged by the Plaintiff in the Complaint and more fully detailed *passim.* is INTENTIONAL invidious discrimination.

40

**C.** **Intentional Invidious Discrimination: The _Arlington Heights_ Factors**

In determining whether racially discriminatory intent or purpose was a motivating factor behind an official action or decision so as to constitute a violation of the equal protection clause of the Fourteenth Amendment, the Supreme Court in _Arlington Heights_ set forth five factors over which the courts must make a sensitive inquiry into such circumstantial and direct evidence of intent as may be available, including (1) the impact of the official action, namely, whether it bears more heavily on one race than another, (2) the historical background of the decision, (3) the specific sequence of events leading up to the challenged decision, (4) any procedural and substantive departures from the norm in connection with the decision or action, and (5) the legislative or administrative history of the decision or action.  429 US 252, 254.

**(1)** **Impact of the Official Action**

As detailed _passim_, the impact of the Official Action is the severe and substantial harm to Gilder in the failure of Gilder to be considered for a shot at the job of NY-11 United States Representative by Gulino and the DCRC and the failure of the NYCBOE to stand as watchdog, all based upon intentional invidious discrimination.  The impact of the harms go to the very heart of Gilder's dignity and to one of the firmest pillars of our United States Constitution, the obligation of our institutions to embrace equal protection of the laws and avoid intentional invidious discrimination in state action taken under the color of law

41

## (2) **The Historical Background of the Decision**

Perhaps nowhere more eloquently has the Fifteenth Amendment and the long history whereby racial minorities have been categorically denied access to the political process than in Justice Sotomayor's dissent in *Schuette v Coalition to Defend Affirmative Action*, ___US___ , ___, 134 SCt 1623, 1654-1656 (2014) (internal citations omitted):

> The Fifteenth Amendment, ratified after the Civil War, promised to racial minorities the right to vote. But many States ignored this promise. In addition to outright tactics of fraud, intimidation, and violence, there are countless examples of States categorically denying to racial minorities access to the political process. Consider Texas; there, a 1923 statute prevented racial minorities from participating in primary elections. After this Court declared that statute unconstitutional, Texas responded by changing the rules. It enacted a new statute that gave political parties themselves the right to determine who could participate in their primaries. Predictably, the Democratic Party specified that only white Democrats could participate in its primaries. The Court invalidated that scheme, too.
>
> Some States were less direct. Oklahoma was one of many that required all voters to pass a literacy test. But the test did not apply equally to all voters. Under a "grandfather clause," voters were exempt if their grandfathers had been voters or had served as soldiers before 1866. This meant, of course, that black voters had to pass the test, but many white voters did not. The Court held the scheme unconstitutional. In response, Oklahoma changed the rules. It enacted a new statute under which all voters who were qualified to vote in 1914 (under the unconstitutional grandfather clause) remained qualified, and the remaining voters had to apply for registration within a 12-day period. The Court struck down that statute as well.
>
> Racial minorities were occasionally able to surmount the hurdles to their political participation. Indeed, in some States, minority citizens were even able to win elective office. But just as many States responded to the Fifteenth Amendment by subverting minorities' access to the polls, many States

responded to the prospect of elected minority officials by undermining the ability of minorities to win and hold elective office. Some States blatantly removed black officials from local offices. Others changed the processes by which local officials were elected.

This Court did not stand idly by. In Alabama, for example, the legislature responded to increased black voter registration in the city of Tuskegee by amending the State Constitution to authorize legislative abolition of the county in which Tuskegee was located, and by redrawing the city's boundaries to remove all the black voters "while not removing a single white voter." The Court intervened, finding it "inconceivable that guaranties embedded in the Constitution" could be "manipulated out of existence" by being "cloaked in the garb of [political] realignment."

This Court's landmark ruling in _Brown v. Board of Education_, triggered a new era of political restructuring, this time in the context of education. In Virginia, the General Assembly transferred control of student assignment from local school districts to a State Pupil Placement Board. And when the legislature learned that the Arlington County school board had prepared a desegregation plan, the General Assembly "swiftly retaliated" by stripping the county of its right to elect its school board by popular vote and instead making the board an appointed body.

Other States similarly disregarded this Court's mandate by changing their political process.

The Court remained true to its command in _Brown_. In Arkansas, for example, it enforced a desegregation order against the Little Rock school board. On the very day the Court announced that ruling, the Arkansas Legislature responded by changing the rules. It enacted a law permitting the Governor to close any public school in the State, and stripping local school districts of their decision making authority so long as the Governor determined that local officials could not maintain "'a general, suitable, and efficient educational system.'"

The States' political restructuring efforts in the 1960's and 1970's went beyond the context of education. Many States tried to suppress the political voice of racial minorities more generally by reconfiguring the manner in which they filled

vacancies in local offices, often transferring authority from the electorate (where minority citizens had a voice at the local level) to the States' executive branch (where minorities wielded little if any influence).

The convoluted nature of the New York Election Law Special Election process for the selection of candidates opens the entire process up to what Justice Sotomayor euphemistically terms "less direct" invidious and intentional racial discrimination that mirrors the discussed "political restructuring efforts" of the 1960s and 1970s.

Moreover, the history of Staten Island Politics bears additional relevant background. There has been only one black elected official on Staten Island – EVER - and that is City Councilwoman Debi Rose, who lost bitterly-contested Democratic Primaries to the afore-mentioned MICHAEL MCMAHON and JON DELGIORNO in a previous election cycle in 2001 (and also lost a Special Election in 2009) before winning the 2009 City Council Primary and General Election. For the record, Gulino was the Chairman of the DCRC in 2009 and Gulino and the DCRC's choice for the Democratic Party candidate was not Debi Rose, but a white male of European Descent. The New York Times' coverage of the 2009 victory stated:

> The North Shore district that Ms. Rose will represent is where much of Staten Island's increasing racial diversity has been concentrated. The district was 47.9 percent white, 22.6 percent black, 5.7 percent Asian and 20.4 percent Hispanic in the 2000 census. The other two districts, by comparison, were 2.1 percent black and 0.9 percent black, according to that census. (Some residents call the expressway that divides the diverse urban area from the mostly white and suburban end of the borough "the Mason-Dixon line.")
>
> Ms. Rose said the North Shore community was the most neglected in the borough, jumping into a well-rehearsed list of complaints and proposals from her campaign. Part of the problem, she said, is that for a long time people of color have

not felt represented. "They were pretty much marginalized, and they were tired of it," she said.

The full New York Times article is attached to the Declaration as Exhibit "K".

The racial divide on Staten Island was only highlighted by the recent death of Eric Garner on July 17, 2014, which was one of the motivations for Mr. Gilder's attempt to gain ballot access and interview for the job of United States Representative.  Mr. Gilder and Mr. Garner were friends.  As reported in the Washington Post:

> Staten Island, often referred to as the "forgotten borough," is the most insular of New York City's five — there is no subway line connecting it to the other boroughs, and the quickest route to Manhattan is usually the ferry. That separateness has bred a fierce loyalty to one's own geography and social group within the communities on the island, too. And none could be more different — and divided — than the north shore, where Garner lived and died, and the south, where a police car keeps a 24-hour watch across from Pantaleo's house.
>
> Describing this north-south divide, one Tompkinsville man, who identified himself by the name Remarkable Blue, said simply:
>
> "There are two Staten Islands. This side and that side."
>
> The tension between the two is the same one animating a national conversation about race right now, only more so. After several deadly confrontations between white police officers and unarmed African American men, the decision last week by a Staten Island grand jury not to indict Pantaleo has again highlighted the country's stubborn racial, economic and cultural divides.

The full Washington Post article is attached to the Declaration as Exhibit "L".

45

### (3) **The Specific Sequence of Events Leading Up To The Challenged Decision**

As detailed *passim*, the sequence of events leading up to the Challenged Decision are the ***"TRANSPARENT PROCESS"*** announced by Gulino and the DCRC, and then the seeming "180 degree shift" in the same ***"TRANSPARENT PROCESS"*** once Gilder expressed interest and the failure of Gilder to be considered for a shot at the job of NY-11 United States Representative by Gulino and the DCRC and the failure of the NYCBOE to stand as watchdog, all based upon intentional invidious discrimination.

### (4) **Any Procedural or Substantive Departures From the Norm In Connection With the Decision**

As detailed *passim*, the sequence of events leading up to the Challenged Decision are the ***"TRANSPARENT PROCESS"*** announced by Gulino and the DCRC, and then the seeming "180 degree shift" in the same ***"TRANSPARENT PROCESS"*** once Gilder expressed interest and the failure of Gilder to be considered for a shot at the job of NY-11 United States Representative by Gulino and the DCRC.  As for the NYCBOE, there is a stark departure from the norm in the acceptable Certificate of Party Nomination that the Board of Elections certified with respect to the NY-11 Special Election and with other Elections Conducted in New York City.  The NYCBOE spends millions to hold elections and ensure that said elections comply with applicable law.  The NYCBOE is clearly cognizant of the importance of anti-discrimination, as is clear from its own Personnel Guidelines.  How is it that the NY-11 Special Election "fell through the cracks" with respect to Mr. Gilder?  Or are the "cracks" in place at the NYCBOE the same cracks that mirror Staten Island's Mason-Dixon Line – geographically, politically and institutionally?

46

**(5) The Legislative or Administrative History of the Decision or Action**

It will be the core of the fact-discovery process to reconstruct Gulino and the DCRC's **_"TRANSPARENT PROCESS"_**.  Additionally, the only "official" record of the NYCBOE's activity with respect to the process is the Certificate of Party Nomination.  It will be the core of the fact-discovery process to reconstruct the NYCBOE and its key personnel's wanton disregard / willful blindness of Gulino and the DCRC's **_"TRANSPARENT PROCESS"_** in the NY-11 Special Election Candidate Selection Process.

**C.    Additional Point: John Gulino is an Elected Official and a Public Figure and Attempts to "Vilify" the Undersigned are an Intentional Strategy to Detract From the Real Issue – Gilder's Civil Rights Claims and the Political and Institutional Culture on Staten Island Giving Rise to Said Claims.**

Gulino and the DCRC may try to make great "hay" out speech and expression engaged in by Mr. Gilder and the undersigned.  It must not be overlooked that John P. Gulino, at all relevant times, is a PUBLIC FIGURE and **ALL** of the speech and expression is **PROTECTED POLITICAL SPEECH** engaged in by Mr. Gilder and the undersigned. _NY Times Co. v Sullivan_, 376 US 254 (1964).  Gulino is the duly-elected Chairman and Party Leader of the Democratic Committee of Richmond County.  He is an elected politician and a public figure.  Nothing here rises to the level of "actual malice".

Mr. Gulino would have the Court go down this rabbit hole in order to obfuscate the fact that Mr. Gilder's civil rights have been intentionally violated on the basis of his race.  Just because the facts that give rise to the claims asserted may have occurred in what some may characterize as a "political battle", it does not mean that Mr. Gilder's rights have been any more or less violated if one dollar, one thousand dollars or one million

47

dollars of Monopoly money is strewn across the sidewalks of Staten Island. _Edmonson v. Leesville Concrete Co._, 500 U.S. 614, 619, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991) ("Racial discrimination" is "invidious in all contexts").

Mr. Gulino goes so far as to suggest that the Complaint "cries out for dismissal and sanction" – further trying to tether the adjudication of the legal rights the aggrieved Mr. Gilder seeks to present to this Court to achieve relief <u>directly to</u> political questions that will only serve the purpose of confusing and obfuscating the issues of intentional invidious discrimination and Constitutional Violation.

If Mr. Gulino truly believes that he has been defamed and his manhood has been injured, HE SHOULD BRING HIS OWN LAWSUIT. He is a lawyer and has been for more years than the undersigned has been alive. Then, Mr. Gulino can see if his claims survive the <u>NY Times Co. v. Sullivan</u> standard of "actual malice".

Moreover, Gulino and the DCRC has strewn the undersigned's personal, political and business issues into the "town square" in their submission to the CM/ECF (#26, November 23, 2015). If Gulino and the DCRC seek to engage in this desperate strategy, then, in furtherance of this matter, the undersigned will continue to seek to expose the dark underbelly of Staten Island Democratic Party politics and a core group that function as a "good ol' boys" network reminiscent of the Pre-Civil Rights Era South and have systematically excluded discrete and insular minorities (and the lawyers that challenge them) from the electoral, political and institutional process.

The sad fact is, a review of Exhibit #9 to the CM/ECF filing #26, November 23, 2015 (the 11/16/2015 Recusal Package) shows a clear incestuous relationship with the

48

Staten Island political process: (Gulino, the DCRC) and the Staten Island's institutional mechanism for the dispensation of justice under state law: (the 13th Judicial District, the District Attorney's Office).  And to that end, the undersigned may be the only lawyer on Staten Island willing to take up Mr. Gilder's case and "upset the applecart" and potentially expose the dark underbelly of Staten Island's institutions.  While Gulino and the DCRC may seek to use the 11/16/2015 Recusal Package for their own purposes, it must be made clear: there, the showing of a perceived appearance of impropriety is _easy_ to make.  Here, the showing of (what Justice Sotomayor has termed as) the "less direct" bias and invidious discrimination in Staten Island Political and Institutional practice is _far more difficult_ a showing, but is one Mr. Gilder has presented as cognizable to this Court based upon the applicable facts at this procedural juncture.

## **CONCLUSION**

**WHEREFORE**, plaintiff respectfully requests that the Court deny the several defendants' motions to dismiss, order fact discovery to commence and grant such other and further relief as may be just, proper, and equitable.

Dated: Staten Island, New York
         November 24, 2015

Respectfully submitted,

/s/ RICHARD A. LUTHMANN

_____
Richard A. Luthmann, Esq.
THE LUTHMANN LAW FIRM, PLLC
1811 Victory Boulevard
Staten Island, NY 10314
Tel.: (718) 447-0003
Fax: (347) 252-0254 (not for service)